United States District Court
Southern District of Texas
ENTERED
September 30, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **SEAN SIMPSON; CHARLA SIMPSON; OS NEW MEXICO, LLC; OS REGIONAL DEVELOPERS COLORADO, LLC; BNS RD LLC; K&L WELLNESS, LLC; LINDA BURBANK; and KEN BURBANK,** | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **Civil Action No. 4:19-CV-02334** |
| **OSTEOSTRONG FRANCHISING, LLC and KYLE ZAGRODZKY,** | § | |
| **Defendants.** | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

OsteoStrong Franchising, LLC ("OsteoStrong") sells franchises for wellness centers that offer customers the use of certain health and exercise equipment. Ken and Linda Burbank ("the Burbanks") and Sean and Charla Simpson ("the Simpsons") (collectively, "the Franchisees") are former OsteoStrong franchisees and "regional developers." The Burbanks had a franchise in Redding, California, and the Simpsons had three franchises in Albuquerque, New Mexico. The Simpsons were regional developers in Colorado and New Mexico, and the Burbanks were regional developers in California. The relationship between OsteoStrong and the Franchisees was governed by franchise agreements ("Franchise Agreements") and franchise broker/regional developer agreements ("Regional Developer Agreements" or "RDAs") (collectively, "the Agreements").

OsteoStrong terminated the Franchisees' RDAs in 2018. After opening their third franchise in April 2019, the Simpsons sued OsteoStrong in this Court in June 2019. The Simpsons abandoned their three franchise locations in March 2020.

The Burbanks (along with three other franchisees who are no longer parties to this lawsuit) sued OsteoStrong in California federal court on October 7, 2020. The Simpsons were plaintiffs in that lawsuit from its inception, alleging many of the same claims they originally filed in this Court. The California lawsuit was transferred to this district and consolidated with this cause of action.

The Franchisees allege that OsteoStrong obtained the Agreements through fraudulent misrepresentations and omissions and that the Agreements are therefore unenforceable. They allege that OsteoStrong misrepresented that its proprietary system could "reverse osteoporosis" and concealed that its principal sales officer had recently been convicted of felony bankruptcy fraud. The Franchisees also allege that the franchises could not be lawfully operated as marketed. The Franchisees ask the Court to find that the Agreements are unenforceable. The Burbanks seek damages. The Simpsons also sought damages, but their affirmative fraud claims were previously dismissed by the Court.

OsteoStrong asserts counterclaims against the Franchisees for breach of the Franchise Agreements, alleging that they abandoned the franchises and failed to pay required monthly fees. OsteoStrong alleges that the Simpsons breached the "injurious acts" provisions in their Franchise Agreements. OsteoStrong also contends that the Simpsons breached their RDAs because they failed to open the required number of

franchises in their regions under the agreed-upon development schedules and violated contractual provisions protecting OsteoStrong's franchise system and brand. OsteoStrong seeks damages for these alleged breaches.

## I. FINDINGS OF FACT

The Court finds that the following facts have been established by a preponderance of the evidence. Any finding of fact that should be construed as a conclusion of law is adopted as such.

### A. THE PARTIES

1. Sean and Charla Simpson reside in the state of Washington. At the time of the events at issue, they resided in New Mexico. They are the principal or sole members of OS New Mexico LLC, BNS RD LLC, and OS Regional Developers Colorado, LLC. All three limited liability companies were formed under the laws of New Mexico, and all members of those companies were residents of New Mexico at all relevant times. [Agreed][1]

2. Ken and Linda Burbank reside in Redding, California, and resided there at all relevant times. They are the sole members of K&L Wellness LLC, a California limited liability company with its principal place of business in California. The Franchise Agreement signed by Ken and Linda Burbank was made on behalf of K&L Wellness, LLC. (Dkt. No. 265-55); (*see also* Dkt. No. 232 at 11). [Agreed]

3. OsteoStrong Franchising, Inc. is a Delaware corporation with its principal place of business in Harris County, Texas. It was originally formed as a Texas limited liability company, OsteoStrong Franchising, LLC, and converted to a Delaware corporation on March 31, 2020. When it was an LLC, OsteoStrong's sole member was Blue Ocean International, LLC, a Delaware entity with its principal place of business in Harris County, Texas. The sole member of Blue Ocean International, LLC was Kyle Zagrodzky. [Agreed]

4. Kyle Zagrodzky is a resident of Tennessee. He is the founder of OsteoStrong and has been its Chief Executive Officer since its inception. (Dkt. Nos. 253 at 77, 86–87; 247-38). [Agreed]

---

[1] The Parties have agreed to certain facts in their Joint Proposed Findings of Fact and Conclusions of Law, (Dkt. No. 271), and are cited as "[Agreed]" throughout this Order.

### B. OSTEOSTRONG'S BACKGROUND

5. Zagrodzky has been in the fitness and exercise industry since 1997. (Dkt. No. 253 at 83–84). [Agreed]

6. Zagrodzky owned and operated Curves franchises in Florida and Texas. (*Id.*). [Agreed]

7. Zagrodzky sold his Curves franchise locations by 2006. (*Id.* at 85). [Agreed]

8. In 2010 or 2011, Zagrodzky began considering starting a new franchise concept. (*Id.* at 86–87). [Agreed]

9. Zagrodzky started OsteoStrong with four centers in Tennessee. [Agreed]

10. At the time of trial, there were 205 OsteoStrong locations worldwide in 14 countries. (*Id.* at 82).

11. OsteoStrong licenses a proprietary system for the operation of a wellness center that offers customers the use of certain health and exercise equipment. (*Id.* at 101–02).

12. OsteoStrong grants franchisees the right to use OsteoStrong trademarks, service marks, logos, and catchphrases in the operation of an OsteoStrong franchise location. (Dkt. No. 247-1 at 5). [Agreed]

13. OsteoStrong provides franchisees with the use of its proprietary business format and system. (*Id.*). [Agreed]

14. From 2012 through 2015, the system included the BioDensity machine ("BioDensity"). (Dkt. No. 232 at 2); (*see also* Dkt. No. 265-22 at 5).

15. John Jaquish is the inventor of BioDensity. (*See* Dkt. No. 250 at 12, 61). [Agreed]

16. Zagrodzky started OsteoStrong after meeting Jaquish. At the time, Jaquish was an employee and part owner of a company called Performance Health Systems ("PHS"), the manufacturer of BioDensity. Jaquish called the machine an "osteogenic loading device." (Dkt. No. 249 at 33). [Agreed]

17. Jaquish was the Chief Technical Officer of PHS starting in January 2004 until September 2015. (Dkt. No. 250 at 7–8, 12–13). [Agreed]

18. Jaquish coined the term "osteogenic loading." (Dkt. No. 253 at 78). [Agreed]

19. Jaquish is the Chief Science Officer of OsteoStrong. (Dkt. No. 250 at 14–15). [Agreed]

20. On October 1, 2015, OsteoStrong and Jaquish entered into a contract to develop the Spectrum equipment ("Spectrum"). (Dkt. No. 265-76). [Agreed]

21. Jaquish Biomedical owns the rights to the Spectrum and licenses those rights to OsteoStrong. (Dkt. No. 250 at 15). [Agreed]

### C. OVERVIEW OF THE CONTRACTS

22. OsteoStrong entered into three Franchise Agreements with the Simpsons and their companies. (Dkt. Nos. 247-1, 247-4, 247-7). These Franchise Agreements were made in June 2013, November 2015, and December 2017 and were for the operation of franchises in Albuquerque, New Mexico. The Simpsons also entered two RDAs with OsteoStrong, effective July 1, 2014, (Dkt. No. 247-16), and August 10, 2014, (Dkt. No. 247-18); (*see also* Dkt. Nos. 265-60, 265-63). [Agreed]

23. OsteoStrong entered into a Franchise Agreement, (Dkt. No. 247-12), and an RDA, (Dkt. No. 247-15), with the Burbanks and their company. [Agreed]

24. Kyle Zagrodzky signed each of the Agreements on behalf of OsteoStrong. (Dkt. Nos. 247-1 at 33, 247-4 at 34, 247-7 at 33, 247-16 at 4, 247-18 at 4, 247-12 at 33, 247-15 at 8).

#### 1. <u>The Burbanks' Agreements</u>

25. Effective April 20, 2014, OsteoStrong and the Burbanks entered into a Franchise Agreement for the opening and operation of an OsteoStrong franchise location in Redding, California (the "Burbank Franchise Agreement"). (Dkt. Nos. 247-12 at 2, 265-55 at 2). [Agreed]

26. Kyle Zagrodzky signed the Burbank Franchise Agreement on behalf of OsteoStrong. [Agreed]

27. Ken and Linda Burbank signed a Personal Guaranty and Undertaking (the "Burbank Guaranty") guaranteeing performance under the Burbank Franchise Agreement. (Dkt. No. 247-13). [Agreed]

28. Effective December 1, 2014, OsteoStrong and the Burbanks entered into a Franchise Broker Agreement for a territory in California (the "Burbank RDA"). (Dkt. Nos. 247-15, 265-66). [Agreed]

29. On November 18, 2020, OsteoStrong sent Linda Burbank a Notice of Breach of the Burbank Franchise Agreement. (Dkt. No. 247-54). [Agreed]

30. The letter stated that Linda had breached the Franchise Agreement by filing suit against OsteoStrong. (*Id.*).

**2. The Simpson Franchise Agreements**

31. Effective June 5, 2013, OsteoStrong and OS New Mexico, LLC entered into a Franchise Agreement for an OsteoStrong franchise to be located at 9577 Osuna Rd NE, Suite 1, Albuquerque, New Mexico 87111 (the "2013 Franchise Agreement"). (*See* Dkt. No. 247-1 at 2, 62). [Agreed]

32. OS New Mexico, LLC is a New Mexico limited liability company owned by Sean and Charla Simpson. (Dkt. No. 251 at 69). [Agreed]

33. Sean Simpson signed the Franchise Agreement for OS New Mexico, LLC in his capacity as member of OS New Mexico, LLC. (Dkt. Nos. 247-1 at 33, 265-22 at 33). [Agreed]

34. Effective November 9, 2015, OsteoStrong and BNS RD, LLC entered into a Franchise Agreement for an OsteoStrong franchise to be located at 10131 Coors Blvd NW Suite H-4, Albuquerque, New Mexico 87114 (the "2015 Franchise Agreement"). (Dkt. Nos. 247-4 at 2, 265-79 at 45). [Agreed]

35. BNS RD, LLC is a New Mexico limited liability company owned by Sean and Charla Simpson. (Dkt. No. 251 at 69). [Agreed]

36. Sean Simpson signed the 2015 Franchise Agreement in his capacity as managing member of BNS RD, LLC. (Dkt. No. 247-4 at 34). [Agreed]

37. Effective December 7, 2017, OsteoStrong and Sean and Charla Simpson entered into a Franchise Agreement for an OsteoStrong franchise to be located in Albuquerque, New Mexico (the "2017 Franchise Agreement"). (Dkt. Nos. 247-7, 265-104 at 49). [Agreed]

38. Zagrodzky signed the 2013, 2015, and 2017 Franchise Agreements on behalf of OsteoStrong. [Agreed]

39. Sean and Charla Simpson signed a Personal Guaranty and Undertaking (the "Simpson Guaranty") guaranteeing performance under the 2013, 2015, and 2017 Franchise Agreements. (Dkt. Nos. 247-2, 247-5, 247-8). [Agreed]

40. On November 8, 2019, OsteoStrong sent the Simpsons Notices of Breach of the Simpson Franchise Agreements. (Dkt. Nos. 247-22, 247-23, 247-24). [Agreed]

41. On April 3, 2020, OsteoStrong sent the Simpsons Notices of Termination of the Simpson Franchise Agreements. (Dkt. Nos. 247-25, 247-26, 247-27). [Agreed]

42. The Notices of Breach asserted that the Simpsons failed to pay royalties and other periodic fees required under the respective agreements. (Dkt. Nos. 247-22, 247-23, 247-24). The Notices of Termination cited the same nonpayment as the basis for terminating the Simpson Franchise Agreements. (Dkt. Nos. 247-25, 247-26, 247-27).

### 3. The Simpson RDAs

43. Effective July 1, 2014, OsteoStrong and the Simpsons entered into a Regional Developer Agreement covering the State of New Mexico (the "Simpson NM RDA"). (Dkt. Nos. 247-16, 265-60). [Agreed]

44. Sean and Charla Simpson signed the RDA on June 24, 2014. [Agreed]

45. The Simpsons paid $17,400 for the rights granted under the Simpson NM RDA. (Dkt. Nos. 265-60 at 2, 251 at 24).

46. Effective August 10, 2014, OsteoStrong and OS Regional Developers Colorado, LLC entered into a Regional Developer Agreement for the State of Colorado (the "Simpson CO RDA"). (Dkt. Nos. 247-18, 265-63 at 2). The Simpsons paid $45,000 for the rights granted under the Simpson CO RDA. (Dkt. Nos. 265-60 at 2, 251 at 24). [Agreed]

47. Sean and Charla Simpson were owners of OS Regional Developers Colorado, LLC. Sean Simpson signed the Simpson CO RDA on behalf of OS Regional Developers Colorado, LLC. [Agreed]

48. Sean and Charla Simpson signed two Personal Guaranty and Undertaking agreements guaranteeing performance under the Simpson RDAs. (Dkt. Nos. 247-17, 247-19). [Agreed]

49. Under the RDAs, OsteoStrong granted the Simpsons the right and obligation to develop OsteoStrong franchise locations in each Territory as set forth in the Development Schedule, including the right for the Simpsons to solicit, qualify, and introduce prospective franchisees to OsteoStrong. [Agreed]

50. In exchange, the Simpsons would receive commissions on franchises sold in the territories. (Dkt. Nos. 265-60 at 13, 265-63 at 13).

51. The New Mexico Development Schedule required the Simpsons to open one OsteoStrong franchise center in 2014, three in 2015, four in 2016, and four in 2017, for a total of 12 by the end of 2017. (Dkt. No. 247-16 at 3). [Agreed]

52. By the end of 2017, the Simpsons had opened a total of five franchise locations in their New Mexico territory. (Dkt. No. 252 at 101). [Agreed]

53. The Colorado Development Schedule required the Simpsons to open three OsteoStrong centers in 2015, three in 2016, and four in 2017, for a total of 10 by the end of 2017. (Dkt. No. 247-18 at 3). [Agreed]

54. By the end of 2017, the Simpsons had opened zero franchise locations in their Colorado territory. (Dkt. No. 252 at 59–60, 101). [Agreed]

55. On April 15, 2018, OsteoStrong sent the Simpsons a Notice of Default and Termination of the Simpson RDAs. (Dkt. No. 247-21). The letter asserted that the RDAs were terminated. It asserted that the primary basis for termination was the "failure to adhere to the Development Schedule" of each RDA, among other reasons. [Agreed]

## D. Relevant Terms of the Agreements

### 1. <u>The Franchise Agreements</u>

56. All of the Franchise Agreements have the following provisions in common:

a. The term of each Franchise Agreement is defined in Section 2.1 as beginning on the Effective Date and expiring 10 years later, "unless earlier terminated." (Dkt. Nos. 247-1 at 2, 6; 247-4 at 2, 6; 247-7 at 2, 6; 247-12 at 2, 6).

b. Section 18.6 states that the Franchise Agreement "shall be binding on the parties and their respective successors and assigns" and required each "Owner" to sign the attached Personal Guaranty and Undertaking. It further states that, "[y]ou and each Owner shall be joint and severally liable for each person's obligations hereunder and under the Personal Guaranty and Undertaking." [Agreed]

c. OsteoStrong granted the Franchisees the right to use OsteoStrong's "System" and "Marks" in connection with the operation of an OsteoStrong franchise. [Agreed]

d. In Section 16.2.2, the Franchisees acknowledged that they had "conducted an independent investigation of OsteoStrong franchise opportunity, and recognize that the business venture contemplated by this Agreement involves business risks and that [its] success will be largely dependent on your ability as an independent business person." (Dkt. Nos. 247-1 at 30, 247-4 at 30, 247-7 at 29, 247-12 at 30). [Agreed]

e. In Section 16.2.3, the Franchisees acknowledged that, except for representations in the Franchise Disclosure Document ("FDD"), neither OsteoStrong nor its agents or representatives "have made

any representations, and you have not relied on representations made by OsteoStrong or its agents or representatives, concerning actual or potential Gross Sales, expenses, or profit of an OsteoStrong center." (Dkt. Nos. 247-1 at 30, 247-4 at 30, 247-7 at 29, 247-12 at 30).

f. In Section 16.2.4, the Franchisees acknowledged that they received a complete copy of OsteoStrong's FDD at least 14 calendar days before signing the respective Franchise Agreement. (Dkt. Nos. 247-1 at 30, 247-4 at 30, 247-7 at 29, 247-12 at 30). [Agreed]

g. In Section 16.2.5, the Franchisees acknowledged that they read and understood the terms of the Franchise Agreement and its attachments and that the Franchisees had ample time and opportunity to consult with an attorney or business advisor of their choosing about the potential risks and benefits of entering into the Franchise Agreement. (Dkt. Nos. 247-1 at 30, 247-4 at 30, 247-7 at 29, 247-12 at 30). [Agreed]

h. Section 18.1, titled Entire Agreement, states: "This Agreement and any other agreements executed by the parties concurrently with the parties' execution of this Agreement represent the entire fully integrated agreement between the parties and supersede all other negotiations, agreements, representations, and covenants, oral or written. Notwithstanding the foregoing, nothing in this Agreement shall disclaim or require you to waive reliance on any representation that Franchisor made in the Franchisor's Franchise Disclosure Document (including its exhibits and amendments) that Franchisor delivered to you in connection with this franchise offering. Except for those changes permitted to be made unilaterally by Franchisor hereunder, no amendment, change or variance from this Agreement shall be binding on either party unless mutually agreed to in writing by the parties and executed by their authorized officers or agents." (Dkt. Nos. 247-1 at 30–31, 247-4 at 31, 247-7 at 30, 247-12 at 30–31).

i. Section 18.2 states: "No waiver or modification of this Agreement or of any covenant, condition, or limitation herein contained shall be valid unless the same is made in writing and duly executed by the party to be charged therewith. No evidence of any waiver or modification shall be offered or received in evidence in any proceeding, arbitration, or litigation between the parties arising out of or affecting this Agreement, or the rights or obligations of any party hereunder, unless such waiver or modification is in writing, duly executed as aforesaid." (Dkt. Nos. 247-1 at 31, 247-4 at 31, 247-7 at 30, 247-12 at 31). [Agreed]

j. Section 4.2 required the Franchisees to pay OsteoStrong a monthly nonrefundable and continuing Royalty Fee during the term of the agreement in the amount specified in the Summary Pages for the Franchisees' right to use the OsteoStrong "System" and "Marks." (Dkt. Nos. 247-1 at 8, 247-4 at 8, 247-7 at 8, 247-12 at 8).

k. Section 9.3 required the Franchisees to pay OsteoStrong a monthly Advertising Fee in the amount stated in the Summary Pages in consideration for the advertising and marketing services OsteoStrong provided at its discretion, during the term of the agreement. (Dkt. Nos. 247-1 at 18, 247-4 at 19, 247-7 at 18, 247-12 at 18).

l. Section 4.4, titled "No Set-Off Rights" states that the Franchisees "may not set off, deduct, or otherwise withhold any fees or other amounts due [OsteoStrong] under this Agreement on the grounds of alleged nonperformance by [OsteoStrong] of any of its obligations and for any other reason. Withholding royalties or any other amounts due Franchisor is a material breach of this Agreement." (Dkt. Nos. 247-1 at 9, 247-4 at 9, 247-7 at 9, 247-12 at 9). [Agreed]

m. Section 18.8 states: "Time is of the essence with respect to all provisions in this Agreement." (Dkt. Nos. 247-1 at 31, 247-4 at 31, 247-7 at 30, 247-12 at 31). [Agreed]

n. Section 18.3 states: "The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement." (Dkt. Nos. 247-1 at 31, 247-4 at 31, 247-7 at 30, 247-12 at 31). [Agreed]

o. The Parties waived punitive or exemplary damages and agreed that any recovery in a dispute will be for sustained actual damages. (Dkt. Nos. 247-1 at 32, 247-4 at 33, 247-7 at 32, 247-12 at 32). [Agreed]

p. Section 13.3 states that OsteoStrong "has the right to terminate this Agreement, which termination will become effective upon delivery of written notice of termination, if you fail to cure the following defaults within 10 days after delivery of written notice: . . . *(b)* failure to pay any amounts due to [OsteoStrong]." (Dkt. Nos. 247-1 at 26, 247-4 at 26, 247-7 at 26, 247-12 at 26) (emphasis in original).

q. Each Franchise Agreement provides, in Section 19.8: "If either party commences a legal action against the other party arising out of or in connection with this Agreement, the prevailing party shall be

entitled to have and recover from the other party its reasonable attorneys' fees and costs of suit." [Agreed]

r. Section 15.1 provides:

> Non-Competition During Term of Agreement. You and each Owner acknowledge that you and each Owner will receive valuable specialized training and Confidential Information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques and trade secrets of Franchisor and the System. You and each Owner covenant and agree that during the term of this Agreement . . . you . . . shall not . . . Divert or attempt to divert any present or prospective customer of the Center to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System.

(Dkt. Nos. 247-1 at 27–28, 247-4 at 28, 247-7 at 27, 247-12 at 28–29).

57. The Simpson 2013 Franchise Agreement required OS New Mexico, LLC to pay OsteoStrong $500 in monthly royalty fees and $100 in monthly advertising fees. (Dkt. No. 247-1 at 2). [Agreed]

58. The Simpson 2015 Franchise Agreement required BNS RD, LLC to pay OsteoStrong $999 in monthly royalty fees and $175 in monthly advertising fees. (Dkt. No. 247-4 at 2). [Agreed]

59. The Simpson 2017 Franchise Agreement required the Simpsons to pay OsteoStrong the greater of 4.5% of gross revenues or $1,200 in monthly royalty fees and $250 in monthly advertising fees. (Dkt. No. 247-7 at 2). [Agreed]

60. The Burbank Franchise Agreement required the Burbanks to pay OsteoStrong $100 in monthly advertising fees. (Dkt. No. 247-12 at 2). [Agreed]

**2. <u>The Simpson RDAs</u>**

61. The Simpson RDAs have the following provisions in common:

a. Each agreement had a 10-year term "unless sooner terminated," (Dkt. Nos. 265-60 at 2, 7; 265-63 at 2, 7), and is governed by Texas law, (Dkt. Nos. 265-60 at 23, 265-63 at 23). *See also infra* note 5.

b. In Section 1.1, OsteoStrong granted the Simpsons the right and obligation "to develop in the Territory the number of OsteoStrong Centers set forth in the Development Schedule." (Dkt. Nos. 265-60 at 6, 265-63 at 6).

c. The RDAs defined "Center" to mean "a wellness center that offers customers the use of certain health and exercise equipment, including a machine which promotes bone and muscle health (the '*bioDensity® machine*') and a vibration plate exercise machine under the 'OsteoStrong' trademarks." (Dkt. Nos. 265-60 at 6, 265-63 at 6).

d. In Section 1.2, OsteoStrong granted the Simpsons the right to "solicit, qualify, and introduce to Franchisor prospective Franchisees to develop Franchised Centers in [each] Territory ("*Sales Services*")." (Dkt. Nos. 265-60 at 6, 265-63 at 6). Section 1.2 further states: "Except as provided in this Section 1.2., this Agreement grants Regional Developer no right to offer, sell, or negotiate the sale of OsteoStrong Center franchises." (Dkt. Nos. 265-60 at 6–7, 265-63 at 6–7).

e. OsteoStrong also agreed that "During the term of this Agreement, Franchisor will not own or operate, or grant anyone but Regional Developer and Prospective Franchisees introduced by Regional Developer in accordance with this Agreement the right to operate, an OsteoStrong Center in the Territory." (Dkt. Nos. 265-60 at 7, 265-63 at 7). [Agreed]

f. Section 5.2, titled Development Schedule, states: "Recognizing that time is of the essence, [the Simpsons] agree[] to satisfy the Development Schedule set forth in the Summary Pages Failure to adhere to the Development Schedule will constitute a material default under this Agreement, as provided in Section 15.2.4." (Dkt. Nos. 265-60 at 8, 265-63 at 8). [Agreed]

g. The Simpsons' RDAs provide, in Section 20.8: "Except as otherwise provided in this Agreement, if either party commences a legal action against the other party arising out of or in connection with this Agreement, the prevailing party shall be entitled to have and recover from the other party its reasonable attorneys' fees and costs of suit." [Agreed]

h. Section 10.5 provides: "During the Term, neither Regional Developer nor any Owner shall: [] Divert any business, customer or prospective franchisee to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and the System." (Dkt. Nos. 265-60 at 15, 265-63 at 15).

i. Section 10.6 provides: "For a two (2)-year period following termination, expiration, or transfer of this Agreement, neither Regional Developer nor any Owner shall: [] Divert any business, customer or prospective Franchisee to any competitor of Franchisor, directly or indirectly, or do or engage in any activity that is likely to injury or prejudice the goodwill associated with the Marks." (Dkt. Nos. 265-60 at 15, 265-63 at 15).

**E. THE FDDS**

62. Prior to offering the Franchise Agreements that the Burbanks and Simpsons entered, OsteoStrong provided the then-prospective Franchisees with a then-current version of its FDD. [Agreed]

63. Each FDD summarized certain provisions of the Franchise Agreement that it preceded. [Agreed]

64. OsteoStrong sent the Simpsons an FDD in connection with their contemplated purchase of a franchise location in New Mexico. (*See* Dkt. No. 265-19). [Agreed]

65. In March 2014, OsteoStrong sent the Burbanks an FDD in connection with their contemplated purchase of an OsteoStrong franchise location in California. (*See* Dkt. No. 247-20).

66. On November 10, 2015, OsteoStrong sent the Simpsons an FDD in connection with their contemplated purchase of an OsteoStrong franchise location in New Mexico. (*See* Dkt. No. 247-106).

67. On August 28, 2017, OsteoStrong sent the Simpsons an FDD in connection with the 2017 Franchise Agreement. (*See* Dkt. No. 265-104).

68. The Simpsons and Burbanks received the FDDs. [Agreed]

69. OsteoStrong delivered the then-current FDD to the Simpsons and Burbanks at least 14 days before each of the Franchise Agreements they signed. (Dkt. No. 253 at 13, 112). [Agreed]

70. OsteoStrong has issued a new FDD each year since at least 2013, generally around April or May. [Agreed]

### 1. <u>FDD Provisions</u>

71. OsteoStrong's FDDs followed the format specified by the Federal Trade Commission's "Franchise Rule." (Dkt. No. 253 at 13–15); *see also* 16 C.F.R. § 436. In Item 2 of an FDD, the Franchise Rule requires franchisors to disclose the franchisor's "directors, trustees, general partners, principal officers, and any other individuals who will have management responsibility relating to the sale or operation of franchises." 16 C.F.R. § 436.5(b). In Item 3, the Franchise Rule requires franchisors to disclose whether any person identified in Item 2 had, during the previous ten years, been convicted of or pleaded nolo contendere to a felony charge. (Dkt. No. 265-160 at 4); 16 C.F.R. § 436.5(c). In Item 4, the Franchise Rule requires disclosure of certain bankruptcy proceedings involving the franchisor and specified affiliated persons, including officers and individuals with management responsibility relating to the sale or operation of franchises. (Dkt. No. 265-160 at 5–6); 16 C.F.R. § 436.5(d).

72. OsteoStrong disclosed information about Zagrodzky in Item 2 of the 2013 FDD. (Dkt. No. 253 at 23). [Agreed]

73. In every subsequent FDD provided to the Franchisees before they signed the Agreements with OsteoStrong, OsteoStrong also disclosed information about Manny Butera in Item 2. (*See* Dkt. No. 247-20). Butera is discussed below. *See infra* I(F)(1).

74. In every FDD provided to the Franchisees before they signed the Agreements with OsteoStrong, OsteoStrong stated that "no litigation is required to be disclosed" in Item 3, and "no bankruptcy information is required to be disclosed" in Item 4. These representations appeared as follows:

**ITEM 3**
**LITIGATION**

No litigation is required to be disclosed in this Item.

**ITEM 4**
**BANKRUPTCY**

No bankruptcy information is required to be disclosed in this Item.

(Dkt. Nos. 265-19, 265-104).

75. Each of the FDDs instructed the Franchisees to "[r]ead this disclosure document and all accompanying agreements carefully[,]" "[r]ead all of your contract carefully," and "[s]how your contract and this disclosure document to an advisor, like a lawyer or accountant." (Dkt. Nos. 265-19 at 1, 247-106 at 1, 265-104 at 1, 247-20 at 1). [Agreed]

76. Each of the FDDs stated, "[i]t is solely [the Franchisees'] responsibility to comply with all applicable laws and regulations and to obtain and keep in force all necessary licenses and permits required by public authorities. Before purchasing the franchise [OsteoStrong] strongly urge[s] you to hire an attorney to review, local, state, and federal laws that may affect your operations or impact your operating costs." (Dkt. Nos. 265-19 at 6, 247-106 at 8, 265-104 at 8, 247-20 at 6). [Agreed]

77. Each of the FDDs also stated, "[OsteoStrong] strongly recommend[s] that [the Franchisees] hire [their] own attorney to help [the Franchisees] evaluate this franchise offering, to identify the laws and regulations that may apply to your Center, to help you set up a business entity, to review and negotiate your lease, to assist you in adapting the Form Membership Agreement to laws and regulations in your state or locality, and for whatever other purpose [the Franchisees] deem appropriate." (Dkt. Nos. 265-19 at 13, 247-106 at 15, 265-104 at 16, 247-20 at 12). [Agreed]

### 2. <u>The Franchisee Questionnaires</u>

78. Each of the FDDs included a Franchisee Questionnaire. (*See* Dkt. Nos. 247-3, 247-9, 247-14, 247-106 at 95–97). [Agreed]

79. In each of the FDDs, the Franchisees acknowledged in the Franchisee Questionnaire that they understood OsteoStrong was acting in reliance on the truthfulness and completeness of their responses to the questions in entering into the Franchise Agreement with the Franchisees. (Dkt. Nos. 247-3 at 3, 247-9 at 2, 247-14 at 3, 247-106 at 97). [Agreed]

80. On June 8, 2013, Sean Simpson on behalf of OS New Mexico, LLC completed and signed the Franchisee Questionnaire attached to the 2013 FDD. (*See* Dkt. No. 247-3 at 3).

81. The Simpsons on behalf of BNS RD, LLC signed the Franchisee Questionnaire attached to the 2015 FDD without answering the questions contained therein. (Dkt. No. 247-106 at 95–97).

82. On December 15, 2017, the Simpsons completed and signed the Franchisee Questionnaire attached to the 2017 FDD. (Dkt. No. 247-9 at 1–3).

83. The Simpsons answered "yes" to the following questions in the 2013 and 2017 Franchisee Questionnaires, and the Burbanks also answered "yes" to the same questions in their Franchisee Questionnaire affirming that they:

a. Received and personally reviewed the Franchise Agreement and each exhibit or schedule attached to it. (Dkt. Nos. 247-3 at 1, 247-9 at 1, 247-14 at 1) [Agreed]

b. Received and personally reviewed the FDD provided by OsteoStrong. (Dkt. Nos. 247-3 at 1, 247-9 at 1, 247-14 at 1). [Agreed]

c. Signed a receipt for the FDD indicating the date it was received. (Dkt. Nos. 247-3 at 1, 247-9 at 1, 247-14 at 1). [Agreed]

d. Understood all the information in the FDD and Franchise Agreement. (Dkt. Nos. 247-3 at 1, 247-9 at 1, 247-14 at 1). [Agreed]

e. Understood the risks of operating an OsteoStrong franchise. (Dkt. Nos. 247-3 at 1, 247-9 at 1, 247-14 at 1). [Agreed]

f. Understood that the success or failure of their franchise will depend in large part upon their skills; abilities and efforts and those of the person you employ, as well as many factors beyond their control such as weather, competition, interest rates, the economic, inflation, labor and supply costs, lease terms and the marketplace. (Dkt. Nos. 247-3 at 1, 247-9 at 1, 247-14 at 1). [Agreed]

g. Understood that the Franchise Agreement provides they can only collect compensatory damages on any claim under or relating to the Franchise Agreement, and not any punitive, exemplary, or multiple damages. (Dkt. Nos. 247-3 at 2, 247-9 at 2, 247-14 at 2). [Agreed]

h. Affirmed that no OsteoStrong employee or other person speaking on its behalf made any statement or promise to them that was not contained in, was contrary to, or was different from the information in the FDD. (Dkt. Nos. 247-3 at 2, 247-9 at 2, 247-14 at 2).

84. In their 2013 Franchisee Questionnaire, the Simpsons answered "yes" to the following questions, affirming that they:

a. Reviewed the FDD and Franchise Agreement with a lawyer, accountant or other professional advisor. (Dkt. No. 247-3 at 1). [Agreed]

b. Discussed the benefits and risks of operating an OsteoStrong franchise with their professional advisor. (*Id.*). [Agreed]

85. In their 2017 Franchisee Questionnaire, the Simpsons answered "no" to the following questions, stating that they had not:

a. Reviewed the FDD and Franchise Agreement with a lawyer, accountant or other professional advisor. (Dkt. No. 247-9 at 1). [Agreed]

b. Discussed the benefits and risks of operating an OsteoStrong franchise with their professional advisor. (*Id.*). [Agreed]

86. On April 20, 2014, the Burbanks completed and signed the Franchisee Questionnaire attached to the 2014 FDD. (Dkt. No. 247-14 at 1–3). [Agreed]

87. The Burbanks answered "no" to the following questions in the Franchisee Questionnaire, stating that they had not:

a. Reviewed the FDD and Franchise Agreement with a lawyer, accountant or other professional advisor. (*Id.* at 1). [Agreed]

b. Discussed the benefits and risks of operating an OsteoStrong franchise with their professional advisor. (*Id.*). [Agreed]

### 3. <u>The Simpsons' General Releases of the FDDs</u>

88. Sean Simpson signed a General Release in conjunction with the 2015 FDD. (Dkt. No. 247-6). [Agreed]

89. Sean Simpson and Charla Simpson signed a General Release in conjunction with the 2017 FDD. (Dkt. No. 247-10). [Agreed]

90. The General Releases stated that the Simpsons released OsteoStrong "from any and all claims, whether at law or in equity, and all contracts, controversies, claims, and demands whatsoever, at law or in equity, that [the Simpsons] ever had, now have, or . . . may have against [OsteoStrong] including, without limitation, all claims arising out of or related to" the Simpson 2015 and 2017 Franchise Agreements. (Dkt. Nos. 247-6, 247-10).

## F. OSTEOSTRONG'S REPRESENTATIONS

### 1. <u>Manny Butera</u>

91. Emanuelle "Manny" Butera was one of OsteoStrong's two officers from November 1, 2012, to February 16, 2018. (Dkt. Nos. 265-16, 265-108).

92. Butera started as OsteoStrong's Vice President of Operations effective November 1, 2012. (Dkt. No. 265-16 at 1). That day, OsteoStrong and Butera entered into an Independent Contractor Agreement under which Butera would work full-time; assist OsteoStrong in all aspects of establishing, operating, and managing OsteoStrong franchise locations in Nashville, Tennessee; promote, offer, and sell OsteoStrong franchises to prospective franchisees; and answer all questions from prospects concerning the business. (Dkt. No. 265-16 at 1–2).

93. By April 2014, Butera's title was Vice President of Operations and Franchise Sales. (Dkt. No. 265-56 at 6). He held that position until his resignation in February 2018. (*See* Dkt. Nos. 265-104 at 9, 265-108).

94. From November 1, 2012, through February 16, 2018, Butera was both an officer of OsteoStrong and a manager with sales and operations duties. (*See* Dkt. No. 253 at 28). Zagrodzky agreed that Butera had management responsibilities related to the sale and operation of franchises. (*Id.* at 16–17).

95. OsteoStrong disclosed Butera as Vice President of Operations and Franchise Sales in Item 2 of the 2014 FDD. (*Id.* at 25). [Agreed] OsteoStrong also disclosed Butera as Vice President of Operations and Franchise Sales in Item 2 of the 2015 and 2017 FDDs. (Dkt. Nos. 247-106 at 8, 265-104 at 9).

96. The Court finds that, from November 1, 2012, through February 16, 2018, Butera was a person whose criminal and bankruptcy history was subject to the disclosures required by Items 3 and 4 of OsteoStrong's FDDs.

97. Butera was convicted of felony bankruptcy fraud in July 2011 and was imprisoned for that conviction. (Dkt. No. 265-7); (*see also* Dkt. Nos. 265-4, 265-6, 254 at 127–28).

98. Butera filed a personal petition for bankruptcy in April 2007. (Dkt. Nos. 265-1, 265-2, 254 at 126).

99. Butera had been the sole owner of at least ten fitness center franchises that filed bankruptcy petitions in December 2006. (*See* Dkt. No. 265-5).

100. Butera completed a Directors & Officers Questionnaire that he provided to OsteoStrong in 2015. (Dkt. No. 247-51). Butera wrote that he had never been convicted of any felony or pleaded *nolo contendere* to any felony charge. (*Id.* at 2). Butera wrote that he had not been held liable in any civil action involving allegations of fraud, unfair or deceptive practices, or comparable allegations. (*Id.*). Butera wrote that he had not filed as a debtor in a bankruptcy petition in the prior ten years. (*Id.* at 3). Butera signed the completed questionnaire on January 21, 2015. (*Id.* at 4).

101. Butera completed a second Directors & Officers Questionnaire that he provided to OsteoStrong in 2016. (Dkt. No. 247-52). Butera wrote that he had never been convicted of any felony or pleaded *nolo contendere* to any felony charge. (*Id.* at 2–3). Butera wrote that he had not been held liable in any civil action involving allegations of fraud, unfair or deceptive practices, or comparable allegations. (*Id.* at 3). Butera wrote that he did not file as a debtor in a bankruptcy petition in the prior ten years. (*Id.* at 4). Butera signed the completed questionnaire on April 20, 2016. (*Id.* at 5).

102. Butera completed a third Directors & Officers Questionnaire that he provided to OsteoStrong in 2017. (Dkt. No. 247-53). Butera wrote that he had never been convicted of any felony or pleaded *nolo contendere* to any felony charge. (*Id.* at 4). Butera wrote that he had not been held liable in any civil action involving allegations of fraud, unfair or deceptive practices, or comparable allegations. (*Id.*). Butera wrote that he had not filed as a debtor in a bankruptcy petition in the prior 10 years. (*Id.* at 5). Butera signed the completed questionnaire on April 1, 2017. (*Id.* at 6).

103. The Franchise Rule required OsteoStrong to disclose Butera in Item 2 of the 2013 FDD. The FDD did not disclose Butera.

104. The Franchise Rule required OsteoStrong to disclose Butera's felony conviction in Item 3 of every FDD OsteoStrong published from 2013 through 2017, because the conviction occurred within the preceding ten-year period covered by each FDD. This included every FDD that OsteoStrong provided to the Franchisees before they signed the Franchise Agreements and RDAs with OsteoStrong.

105. The Franchise Rule required OsteoStrong to disclose Butera's personal bankruptcy in Item 4 of every FDD OsteoStrong published from 2013 through 2017, because the bankruptcy occurred within the preceding ten-year period covered by each FDD. This included every FDD that OsteoStrong provided to the Franchisees before they signed the Franchise Agreements and RDAs with OsteoStrong.

106. The Franchise Rule required OsteoStrong to disclose Butera's business bankruptcies in Item 4 of every FDD OsteoStrong published from 2013 through 2016, because the bankruptcies occurred within the preceding ten-year period covered by those FDDs. This included every FDD that OsteoStrong provided to the Franchisees before they signed the Franchise Agreements and RDAs with OsteoStrong, with the exception of the Simpson 2017 Franchise Agreement.

107. OsteoStrong did not disclose any of this criminal or bankruptcy history in any of its FDDs. (Dkt. No. 253 at 27–28).

108. The Court finds that OsteoStrong's statements in Items 3 and 4 of each FDD published from 2013 through 2017 asserting that it had "nothing to disclose," were false.

109. Butera resigned from OsteoStrong on February 16, 2018. (Dkt. No. 265-108).

**2. <u>The Franchisees' Reliance</u>**

110. OsteoStrong included false statements about Butera's background in every FDD that it provided to the Franchisees before they entered into the Agreements with OsteoStrong.

111. Specifically, OsteoStrong provided the Burbanks with a copy of its 2013 FDD before they entered the Burbank Franchise Agreement. Likewise, OsteoStrong provided the Simpsons with a copy of its 2013 FDD before they entered into the 2013 Franchise Agreement. OsteoStrong represented in the 2013 FDD that nothing "[was] required to be disclosed" in Items 3 and 4. (Dkt. No. 265-19 at 6–7).

112. The Franchisees read the 2013 FDD before entering into their respective Franchise Agreements. (Dkt. Nos. 254 at 17, 251 at 71). The Simpsons also had an attorney review it. (Dkt. No. 251 at 71).

113. The Franchisees relied on these representations in deciding whether to contract with OsteoStrong. (*See* Dkt. Nos. 254 at 17–18; 251 at 13, 71–74).

114. The Burbanks—one of whom was a police officer—testified that they would never have entered the Burbank Agreements if OsteoStrong had disclosed that Butera had been convicted of felony bankruptcy fraud just two years earlier. (Dkt. No. 254 at 17–18).

115. Likewise, the Simpsons—one of whom had a security clearance at Sandia National Laboratories—testified that they would never have entered into the Simpson Agreements if OsteoStrong had disclosed that Butera had recently been convicted of felony fraud. (Dkt. No. 251 at 13, 71–74).

### 3. <u>OsteoStrong's Knowledge of Butera's Background</u>

#### a. <u>Butera's Knowledge</u>

116. Butera, while an officer of OsteoStrong, knew the facts and dates of his own felony conviction and bankruptcy filing and of the bankruptcy filings of his businesses. (Dkt. No. 254 at 126–28).

117. The Court finds that OsteoStrong had actual knowledge during the relevant disclosure periods of Butera's bankruptcy-fraud conviction and bankruptcy filing because Butera—an officer of the company—had actual knowledge of those facts.

#### b. <u>Zagrodzky's Knowledge</u>

118. Zagrodzky was introduced to Butera by mutual acquaintances in 2011. (Dkt. No. 253 at 21). Zagrodzky was told that Butera had a lot of experience in the health and wellness industry. (*Id.*). Butera told Zagrodzky that he once owned 20 World Gym franchises and managed Equinox fitness gyms. (*Id.*). [Agreed]

119. Butera started working for OsteoStrong shortly after his release from prison. (Dkt. No. 254 at 130). He was on supervised release for the first two years of his employment by OsteoStrong. (*Id.* at 131).

120. Zagrodzky described Butera to others as his "brother[] from another mother," said they were "super tight," and claimed that he and Butera had "worked in the industry for a long time together." (*Id.* at 87); (Dkt. No. 251 at 70–71).

121. Zagrodzky knew, when he hired Butera, that Butera had filed for bankruptcy. (Dkt. Nos. 253 at 124, 254 at 163).

122. Zagrodzky admitted he did nothing to investigate when that bankruptcy filing had occurred, or what had happened to the 20 World Gym franchises. (Dkt. No. 253 at 22–23).

123. Zagrodzky told Butera that he intended to conduct a full background check on him before hiring him, and he collected information from Butera (his birth date, Social Security number, etc.) for that purpose. (Dkt. No. 254 at 132). But Zagrodzky denied that he ever ran the background check on Butera or otherwise investigated Butera's background before hiring him. (Dkt. No. 253 at 21–22).

124. Zagrodzky testified that he and OsteoStrong relied on advice of counsel about what information had to be disclosed in the 2013 FDD, (*id.* at 23), and the 2014 FDD, (*id.* at 25–26).

125. Butera testified that Zagrodzky told him to limit his answer to any bankruptcies or convictions that occurred while he was with OsteoStrong. (Dkt. Nos. 254 at 140–43, 161–63, 171–72).

126. Zagrodzky denied Butera's allegations and testified that, prior to publishing OsteoStrong's 2013 FDD, he was not involved in determining whether any litigation involving Butera required disclosure, (Dkt. No. 253 at 23–24), or in determining the date of Butera's bankruptcy, (*id.* at 24, 28–29).

127. John Jaquish testified that Butera's legal troubles were widely known in the fitness franchising industry. Jaquish said that, while in California and around six months after OsteoStrong started buying BioDensity, he learned of Butera's legal troubles, and told Zagrodzky a couple of months later. Jaquish said that he was told it involved some kind of gym financing deal and, although he couldn't remember the details, "I feel like it was something criminal and I think he went to jail for it." (Dkt. No. 250 at 15–17).

128. The Court finds, based on the credible testimony of Jaquish and Butera, that they informed Zagrodzky of Butera's felony conviction and prior bankruptcies.

129. The Court finds Zagrodzky's testimony about not knowing when Butera's bankruptcy filing occurred to be unpersuasive and lacking in credibility. The Court had the opportunity to observe the testimony of the various witnesses at trial. After evaluating the credibility of the witnesses and the other evidence presented at trial, the Court finds that the preponderance of the evidence shows that, as early as 2013,

Zagrodzky knew that OsteoStrong was required to disclose, in Items 3 and 4 of the FDD, that Butera had been convicted of a felony within the previous 10 years and that Butera had filed for bankruptcy protection within the previous 10 years.

130. The Court finds that OsteoStrong had actual knowledge during the relevant disclosure periods of Butera's bankruptcy-fraud conviction and bankruptcy filing because Zagrodzky had actual knowledge of those things.

131. The Court also finds that, at a minimum, OsteoStrong was reckless with respect to the truth or falsity of its representations that there was nothing to disclose during the relevant disclosure periods. Zagrodzky was an officer of OsteoStrong, knew that Butera had filed for bankruptcy, possessed the information needed to perform a background check of Butera, and nevertheless declined to conduct one. Put differently, despite knowing that he lacked sufficient information to verify Butera's background and having the means to obtain that information, Zagrodzky consciously chose not to conduct even a basic inquiry before representing that there was nothing to disclose.

### G. SEAN SIMPSON'S DAMAGE TO THE OSTEOSTRONG BRAND

132. The Simpson Franchise Agreements prohibited the Simpsons from performing, directly or indirectly, any act injurious or prejudicial to the goodwill associated with the OsteoStrong trademarks or system. (Dkt. Nos. 247-1 at 27–28, 247-4 at 28, 247-7 at 27). The Simpson RDAs contained similar prohibitions. (Dkt. Nos. 247-16 at 15–16, 247-18 at 15–16).

133. The Parties dispute whether:

a. Sean Simpson told other regional developers and franchisees that he intended to "take the company down," (Dkt. No. 256 at 28–29); (*see also* Dkt. No. 243-1 at 24);

b. Simpson notified other regional developers and franchisees that Butera's bankruptcy and conviction were not disclosed in the FDDs, that Zagrodzky was a liar, and that continued operation of the franchises could expose them to criminal liability, (*see* Dkt. No. 243-1 at 3–4, 22, 28);

c. Simpson attempted to recruit other franchisees to join a lawsuit and discussed his claims with them, (*see* Dkt. Nos. 243-1 at 26–28, 247-87, 247-89, 247-90, 247-91, 247-92, 247-93, 247-94, 247-96, 247-97, 247-100, 247-101, 247-103, 247-104, 247-105, 252 at 79–87);

d. The Simpson Agreements requiredthe Simpsons to submit any complaints to nonbinding mediation before filing suit and if so,

whether the Simpsons participated in mediation, (*see* Dkt. Nos. 247-1 at 31, 247-4 at 32, 247-7 at 31, 255 at 16–17);

e. Herb Ebel would have opened additional franchises but for Simpson's conduct, (*see* Dkt. No. 252 at 35–37, 40–41, 46);

f. Simpson caused John Baird to close his franchise or not to open a second franchise, (*see id.* at 96–98); (Dkt. No. 243-3 at 12);

g. Simpson caused Mary Jo McHenry to close her franchise, (*see* Dkt. Nos. 252 at 96–98; 243-2 at 20–22, 26); and

h. Simpson caused Brett Kurihara to close his franchise, (*see* Dkt. Nos. 252 at 96–98; 243-4 at 17).

134. Because the Court concludes that the Simpson Agreements were fraudulently induced, *see infra* II(B)(8), and the Simpsons were excused from performance under those Agreements, *see infra* II(C)(2)(a), II(C)(5), the Court need not resolve these factual disputes or determine whether any of the disputed conduct constituted an act "injurious or prejudicial to the goodwill associated with the OsteoStrong trademarks or system."

## H. DAMAGES

### 1. The Franchisees' Damages

135. The Burbanks suffered out-of-pocket losses of at least $244,242 that directly resulted from the Burbank Agreements with OsteoStrong. (Dkt. Nos. 265-150, 254 at 59–61).

136. Linda Burbank testified that this amount consisted of fees paid to OsteoStrong and expenses incurred in opening and running the businesses, less any income received. (Dkt. No. 254 at 59–61); (*see also* Dkt. No. 265-150).

137. The Court finds that the Burbanks' out-of-pocket losses are credible, well-supported, and calculated with reasonable certainty.

138. The Simpsons claim that they suffered out-of-pocket losses of at least $471,400 that directly resulted from their agreements with OsteoStrong. (Dkt. No. 251 at 33–34).

139. Charla Simpson testified that this amount consisted of $17,400 for the regional developer fee under the Simpson NM RDA, $45,000 for the regional developer fee under the Simpson CO RDA; $109,000 for the "initial investment in the first center;" and "about [$]150,000" associated with "open[ing] two more stores eventually." (*Id.*).

Charla Simpson testified that one of the three stores became profitable but that the other two were not. (*Id.* at 34); (*see also* Dkt. Nos. 265-60, 265-63).

140. In closing argument, Franchisees' counsel characterized this as the "offset" amount. (Dkt. No. 272 at 10, 55). This is consistent with the Joint Pretrial Order. (Dkt. No. 232 at 7 ("The Burbanks and Simpsons lost hundreds of thousands of dollars that they invested in reliance on OsteoStrong's representations. . . . [T]he Simpsons are entitled to use those damages as an offset against any amounts the [C]ourt might find them liable for.")).

141. The Court finds that the Simpsons' out-of-pocket losses are not calculated with reasonable certainty and are not well-supported. Charla Simpson did not testify about any income received under the Simpson Franchise Agreements or Simpson RDAs despite stating that at least one store was profitable. (Dkt. No. 251 at 34). Accordingly, the initial investment costs should have been offset by any income received but weren't, indicating that the claimed out-of-pocket losses are overstated. Charla Simpson testified that the costs associated with two of the stores were "about" $150,000. (*Id.*).[2] And the Simpsons did not provide any contemporaneous documentation supporting the initial investment costs.

142. In any event, even if the Simpsons had established their out-of-pocket losses with reasonable certainty, they are not entitled to an award of affirmative relief or any "off-set" amount. The Simpsons are not entitled to recover any out-of-pocket losses from OsteoStrong based on their affirmative fraudulent-inducement claim, because the claim was already dismissed at summary judgment and the Court declines to vacate that decision. *See infra* II(A). The Simpsons are also not entitled to an offset amount because the Court ultimately concludes that the Simpsons are not liable to OsteoStrong for any damages. *See infra* II(C)(6).

### 2. <u>OsteoStrong's Damages</u>

#### a. <u>The Simpson Franchise Agreements</u>

143. On November 8, 2019, OsteoStrong sent letters to OS New Mexico, LLC, BNS RD, LLC, and the Simpsons providing written notice of breach of the 2013, 2015, and 2017 Franchise Agreements based on the failure to pay contractual monthly royalty and advertising fees. (Dkt. Nos. 247-22, 247-23, 247-24). [Agreed]

[2] To be sure, there was no testimony or evidence presented to suggest that the income received by the Simpsons exceeded their initial investment costs. The Court therefore concludes that the Simpsons were injured, albeit for some unknown amount.

144. On April 3, 2020, OsteoStrong sent a letter to OS New Mexico, LLC, BNS RD, LLC, and the Simpsons providing written notice of termination of the 2013, 2015, and 2017 Franchise Agreements. (Dkt. Nos. 247-25, 247-26, 247-27). [Agreed]

145. Under the Simpson 2013 Franchise Agreement, from June 5, 2013, to June 1, 2018, OS New Mexico, LLC paid contractual monthly royalty and advertising fees to OsteoStrong. (Dkt. No. 252 at 94). [Agreed]

146. On June 1, 2018, OS New Mexico, LLC stopped paying contractual monthly royalty and advertising fees to OsteoStrong. (*Id.* at 63, 94).

147. At that time, there were 60 months remaining on the original 10-year term. (*See* Dkt. No. 247-1). [Agreed]

148. There were 21 months remaining until OsteoStrong terminated the 2013 Franchise Agreement on April 3, 2020.

149. Under the Simpson 2015 Franchise Agreement, from November 9, 2015, to December 1, 2018, BNS RD, LLC paid contractual monthly royalty and advertising fees to OsteoStrong. (Dkt. No. 252 at 94). [Agreed]

150. On December 1, 2018, BNS RD, LLC stopped paying contractual monthly royalty and advertising fees to OsteoStrong. (*Id.*). [Agreed]

151. At that time, there were 83 months remaining on the 2015 Franchise Agreement's 10-year term. (Dkt. Nos. 247-4, 252 at 94). The Franchisees argue that there were 16 months remaining until OsteoStrong terminated the 2015 Franchise Agreement on April 3, 2020.

152. Under the Simpson 2017 Franchise Agreement, from December 7, 2017, to June 1, 2018, the Simpsons paid contractual monthly royalty and advertising fees to OsteoStrong. (Dkt. No. 252 at 63, 67–68). [Agreed]

153. On June 1, 2018, the Simpsons stopped paying contractual monthly royalty and advertising fees to OsteoStrong. (*Id.*). [Agreed]

154. At that time, there were 104 months remaining on the 2017 Franchise Agreement's 10-year term. (Dkt. Nos. 247-7, 252 at 94). The Franchisees argue that there were 21 months remaining until OsteoStrong terminated the 2017 Franchise Agreement on April 3, 2020.

155. The Simpsons dispute the damages owed to OsteoStrong for the monthly royalty and advertising fees under the 2013, 2015, and 2017 Franchise Agreements and specifically whether the fees should be calculated based on the remainder of the 10-year term or through the termination of each respective agreement. Because the Court

concludes that the Simpson Franchise Agreements were fraudulently induced, *see infra* II(B)(8), and the Simpsons were excused from performance thereunder, *see infra* II(C)(5), the Court need not resolve the factual disputes concerning the extent of OsteoStrong's alleged financial losses under the Simpson Franchise Agreements.

b. <u>The Burbank Franchise Agreements</u>

156. On November 18, 2020, OsteoStrong sent a letter to the Burbanks providing written notice of breach of the Burbank Franchise Agreement based on their filing of a lawsuit against OsteoStrong and failing to submit to pre-suit mediation. (Dkt. No. 247-54).

157. On December 31, 2020, the Burbanks abandoned their OsteoStrong center. (Dkt. No. 254 at 74).

158. Under the Burbank Franchise Agreement, from April 20, 2014, to December 1, 2020, the Burbanks paid contractual monthly advertising fees to OsteoStrong. (*Id.* at 71–74). [Agreed]

159. After December 1, 2020, OsteoStrong stopped taking automatic deductions from the Burbanks' bank account. (*Id.* at 74). At that time, there were 41 months remaining on the agreement's 10-year term. (*See* Dkt. Nos. 247-12, 252 at 102). [Agreed]

160. The Parties dispute the total fees owed under the Burbank Franchise Agreement and whether the Burbanks owed any royalty fees. However, because the Court concludes that the Burbank Franchise Agreement was fraudulently induced, *see infra* II(B)(8), and the Burbanks were excused from performance thereunder, *see infra* II(C)(5), the Court need not resolve the factual discrepancies regarding the extent of OsteoStrong's alleged financial losses under the Burbank Franchise Agreement.

c. <u>The Simpson RDAs</u>

161. On April 15, 2018, OsteoStrong sent a letter to the Simpsons providing written notice of default and termination of the Simpson NM RDA for failure to meet the required Development Schedule. (Dkt. No. 247-21). [Agreed]

162. The Parties dispute (1) whether the Simpsons failed to comply with the Simpson NM RDA by failing to satisfy the Development Schedule, (2) the damages from the franchise fees that OsteoStrong would have earned from any additional centers in the territory, (3) the damages from the lost equipment sales, (4) the damages from the royalty fees that OsteoStrong would have earned from any additional centers in the territory, and (5) the damages from the advertising fees that OsteoStrong would have earned from any additional centers in the territory. However, because the Court concludes that the Simpson NM RDA was fraudulently induced, *see infra* II(B)(8), and the Simpsons were excused from performance thereunder, *see infra* II(C)(5), the Court need not resolve the

disputes concerning the extent of OsteoStrong's alleged financial losses under the Simpson NM RDA.

163. On April 15, 2018, OsteoStrong sent a letter to the Simpsons providing written notice of default and termination of the Simpson CO RDA for failure to meet the required Development Schedule. (Dkt. No. 247-21). [Agreed]

164. The Parties dispute whether (1) the Simpsons failed to comply with the Simpson CO RDA by failing to satisfy the Development Schedule, (2) the damages from the franchise fees that OsteoStrong would have earned from any additional centers in the territory, (3) the damages from the lost equipment sales, (4) the damages from the royalty fees that OsteoStrong would have earned from any additional centers in the territory, and (5) the damages from the advertising fees that OsteoStrong would have earned from any additional centers in the territory. However, because the Court concludes that the Simpson CO RDA was fraudulently induced, *see infra* II(B)(8), and the Simpsons were excused from performance thereunder, *see infra* II(C)(5), the Court need not resolve the factual discrepancies regarding the extent of OsteoStrong's alleged financial losses under the Simpson CO RDA.

d. Sean Simpson's Injurious Acts

165. Because the Court concludes that the Simpson Franchise Agreements and Simpson RDAs were fraudulently induced, *see infra* II(B)(8), and the injurious-act provisions were therefore unenforceable, *see infra* II(C)(5), the Court need not determine the extent of OsteoStrong's alleged damages stemming from Sean Simpson's alleged breaches of the injurious-act provisions.

## II. CONCLUSIONS OF LAW

Based upon the above findings of fact, the record, and arguments of the Parties at the bench trial, the Court enters the following conclusions of law. Any conclusion of law that should be construed as a finding of fact is adopted as such.

### A. THE SIMPSONS' AFFIRMATIVE CLAIM FOR FRAUDULENT INDUCEMENT

166. In 2021, Judge Lynn N. Hughes, then presiding over this case, granted OsteoStrong's motion for summary judgment dismissing the Simpsons' fraudulent-inducement claim. (Dkt. No. 101 at 4). The Simpsons ask the Court to revise or vacate the prior order dismissing their affirmative fraudulent-inducement claim and award them damages on that claim.

167. As an initial matter, the Simpsons have not previously moved under Federal Rule of Civil Procedure 54[3] to reconsider that decision. And the Simpsons first raised their disagreement with the dismissal in October 2024 in a response to a different summary-judgment motion by OsteoStrong. (Dkt. No. 201 at 10–12).

168. This Court has also already rejected the Simpsons' request to revive their previously dismissed fraud and fraudulent-inducement claims. (Dkt. No. 223). Specifically, the Court overruled the Simpsons' objections to Magistrate Judge Dena Palermo's Report and Recommendation and accepted the Report's findings, conclusions, and recommendation. (Dkt. Nos. 222, 223).

169. The Simpsons did not identify any affirmative claim for fraudulent inducement in the Joint Pretrial Order. (*See* Dkt. No. 232 at 4–5). Nor did the Simpsons mention at any point in the trial that they were seeking reinstatement of their affirmative fraudulent-inducement claim. Instead, the Simpsons characterized $482,000, the amount they now seek as affirmative relief on their fraudulent-inducement claim, as the "set off" amount. (Dkt. No. 272 at 10).

170. Although Rule 54(b) permits revision of interlocutory orders, it does not require it. Whether to reconsider an interlocutory order is committed to the district court's discretion. *See McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 701–02 (5th Cir. 2014). The Fifth Circuit has upheld a district court's refusal to revisit an earlier ruling based on arguments and evidence that could have been presented earlier. *See id.* at 701–02. Accordingly, given the procedural history described above, the Court declines to vacate the prior summary judgment as to the Simpsons' affirmative fraudulent-inducement claim.

### B. FRAUDULENT INDUCEMENT

171. The Court considers the Burbanks' affirmative fraudulent-inducement claim against OsteoStrong and Zagrodzky as well as the Burbanks' and Simpsons' fraudulent-inducement affirmative defense to OsteoStrong's breach-of-contract counterclaim.

172. OsteoStrong contends that the Franchisees' fraud theories are limited to the specific representations and omissions that were pleaded with particularity in their respective complaint and answer, as required by Federal Rule of Civil Procedure 9(b). Specifically, the Burbanks did not plead fraud claims against Zagrodzky individually. (*See* Dkt. No. 214). And, in pleading their fraud affirmative defense, the Simpsons alleged that the only bases for the defense were Butera's criminal and bankruptcy history and

[3] Federal Rule of Civil Procedure 54(b) allows parties to seek reconsideration of interlocutory orders and authorizes a district court to revise any order or decision that does not end the case.

OsteoStrong's representations that it could treat, cure, or mitigate disease. (Dkt. No. 181 at 2–3).

173. The Franchisees disagree with OsteoStrong's characterization of their pleadings. Additionally, even if the pleadings were lacking, the Franchisees argue that these claims and defenses were plainly stated in the Joint Pretrial Order. (*See* Dkt. No. 232 at 4–5). For instance, the Joint Pretrial Order states, "Plaintiff K&L Wellness's causes of action against Defendants OsteoStrong and Kyle Zagrodzky for common law fraud (including fraudulent concealment and fraudulent inducement)." (*Id.* at 5); (*see also* Dkt. No. 235).

174. "It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial." *Kona Tech. Corp v. S. Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000). OsteoStrong cites no authority for the proposition that Rule 9(b) prevents a joint pretrial order from superseding the pleadings as to the fraud claims and defenses presented at trial.

175. The Court agrees with the Franchisees and concludes that it may consider the Burbanks' claims against Zagrodzky in his individual capacity and all bases for the Simpsons' fraud-based affirmative defense that were stated in the Joint Pretrial Order. (*See* Dkt. No. 232 at 4–5).

### 1. <u>Legal Standard</u>

176. A contract is subject to avoidance if it was fraudulently induced. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331 (Tex. 2011). To prevail on a fraudulent-inducement defense, the defendant must establish the elements of fraud "as they relate to an agreement between the parties." *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 328 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (quoting *Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001)). The elements of fraud are: (1) that a speaker made a material representation, (2) the representation was false, (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion, (4) the speaker made the representation with the intent that the other party should act upon it, (5) the party acted in reliance on the representation, and (6) the party thereby suffered injury. *Italian Cowboy*, 341 S.W.3d at 337 (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam)). [Agreed]

177. To recover actual damages for fraud, and to assert fraud as a defense, requires proof by a preponderance of the evidence. *Huynh v. Phung*, No. 01-04-00267-CV, 2007 WL 495023, at *2 & n.1 (Tex. App.—Houston [1st Dist.] Feb. 16, 2007, no pet.); *see Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 221 (Tex. 2019) (describing preponderance as the standard for a fraud claim). [Agreed]

### 2. <u>Material Representations</u>

178. A representation is material if "a reasonable person would attach importance to [it] and would be induced to act on the information in determining his choice of actions in the transaction in question." *Italian Cowboy*, 341 S.W.3d at 337. [Agreed]

179. When considering whether to invest time and money into a business opportunity, a reasonable person would attach importance to whether the principal salesperson for the opportunity had been convicted of felony fraud, and whether franchises that person previously owned had filed for bankruptcy. *See Carroll v. Farooqi*, 486 B.R. 718 (N.D. Tex. 2013) (confirming fraud judgment based on franchisor's failure to disclose litigation, and the prior bankruptcy of the franchisor's CEO, in its FDD). The purpose of the Franchise Rule is to "give prospective purchasers of franchises the material information they need in order to weigh the risks and benefits of such an investment." Press Release, Fed. Trade Comm'n, FTC Issues Updated Franchise Rule (Jan. 23, 2007), <u>https://www.ftc.gov/news-events/news/press-releases/2007/01/ftc-issues-updated-franchise-rule</u>; *see* 16 C.F.R. pt. 436.

180. The Franchisees testified that they would not have entered into the Agreements had they known of Butera's felony conviction and bankruptcy history. *See supra* I(F)(2).

181. OsteoStrong argues that on May 31, 2018, after OsteoStrong terminated their RDAs, the Simpsons notified OsteoStrong about Butera's felony conviction and bankruptcy history. Instead of terminating the Franchise Agreements, the Simpsons represented they wanted to continue their business relationship with OsteoStrong and never stated that they would not have entered into the Franchise Agreements or RDAs had they known about Butera's background. (*See* Dkt. No. 247-59).

182. The Court rejects OsteoStrong's argument. The Simpsons' conduct after learning of Butera's background does not establish that the information was immaterial when they entered into the Agreements. Moreover, OsteoStrong's characterization does not account for the entire contents of the letter. The Simpsons also demanded that OsteoStrong "[c]ease all fraudulent behavior" as a condition (among many) for continuing the relationship. (*Id.* at 11). The Simpsons also demanded $6,400,000 in exchange for a buy-out. (*Id.* at 11). What's more, the letter explicitly states that "[n]othing in this letter should be construed as a waiver of any of our rights or remedies in this matter, all of which we expressly reserve." (*Id.* at 15).

183. The Court concludes that OsteoStrong's "nothing to disclose" statements were material.

### 3. False Representations

184. The Court considers OsteoStrong's "nothing to disclose" representations in light of the fact that they were made in its FDDs, that OsteoStrong purported to have superior knowledge of the backgrounds of its executives, and that OsteoStrong intended those FDDs to satisfy the requirements and format prescribed by the Federal Trade Commission's "Franchise Rule."

185. The Franchise Rule provides:

> In connection with the offer or sale of a franchise to be located in the United States of America . . . it is an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act: [] For any franchisor to fail to furnish a prospective franchisee with a copy of the franchisor's current disclosure document, as described in subparts C and D of this part, at least 14 calendar-days before the prospective franchisee signs a binding agreement with, or makes any payment to, the franchisor or an affiliate in connection with the proposed franchise sale.

16 C.F.R. § 436.2.

186. The Franchise Rule also requires specified disclosures in Items 2 through 4 of an FDD. *See supra* I(E)(1).

187. Under the Franchise Rule, OsteoStrong was required to disclose Butera's felony conviction in Item 3 and his qualifying bankruptcy history in Item 4. *See* 16 C.F.R. § 436.5(c)(1)(iii)(A), (d)(1). Because OsteoStrong instead affirmatively stated that it had "nothing to disclose" in those Items, those statements were false.

188. The Court concludes that OsteoStrong made false representations to the Franchisees each time it provided them with an FDD that affirmatively stated that it had "nothing to disclose" with respect to Items 3 and 4.

189. Contrary to OsteoStrong's contentions, considering the Franchise Rule in the context of representations made in an FDD does not turn a common-law fraud claim into an impermissible effort to "enforce" the Franchise Rule. The Franchisees do not assert a private cause of action under the Franchise Rule; rather, the Rule is relevant to whether the affirmative representations OsteoStrong made in its FDDs were false. Courts have repeatedly recognized that representations and omissions in an FDD can serve as the basis for other independent state-law claims, such as common law fraud. *See, e.g.*, *Carroll v. Farooqi*, 486 B.R. 718, 724 (N.D. Tex. 2013) (finding fraudulent inducement sufficiently pled when based on FDD's failure to disclose the prior bankruptcy of the

franchisor's chairman/CEO/president/CFO); *Altruist, LLC v. Medex Patient Transp., LLC*, 308 F.Supp.3d 943, 951 (M.D. Tenn. 2018) (upholding arbitration award that "was not based upon the Franchise Rule," but based on the misrepresentations contained in the FDD); *Texas Cookie Co. v. Hendricks & Peralta, Inc.*, 747 S.W.2d 873, 877 (Tex. App.—Corpus Christi 1988, writ denied) ("Appellee clearly did not bring an action under federal law. Appellants' violation of federal law was merely used as a basis for finding an independent violation of the DTPA."); *Hanley v. Doctors Express Franchising, LLC*, No. 1:12-CV-00795, 2013 WL 690521, at *21 (D. Md. Feb. 25, 2013) (holding that untrue statements in an FDD will support a common-law fraud claim); *TC Tech. Mgmt. Co. v. Geeks on Call Am., Inc.*, No. 2:03-CV-00714, 2004 WL 5154906, at *5 (E.D. Va. Mar. 24, 2004) ("TC Tech can use GOC's alleged violation of a federal regulation [the Franchise Rule] to help establish that GOC violated a duty to disclose information to TC Tech."). As one court observed, "the federal duty to make certain disclosures in an FDD may form part of the foundation of a state fraud claim—not because the state cause of action actually 'enforces' the federal Franchise Rule, but because the Franchise Rule, like any binding disclosure obligation, changes the landscape of which omissions can be considered false or misleading." *Lunt v. Frost Shades Franchising, LLC*, No. 3:22-CV-00775, 2023 WL 3484202, at *8 (M.D. Tenn. May 16, 2023). This conclusion is consistent with *Yumilicious Franchise, L.L.C. v. Barrie*, which held that the Franchise Rule itself creates no private cause of action and that a violation of the Rule, standing alone, does not establish a Texas DTPA violation. 819 F.3d 170, 176 (5th Cir. 2016). Here, the Franchisees' claims depend on proof of the elements of Texas common-law fraud, not merely a violation of the Franchise Rule.

190. The Parties also dispute whether OsteoStrong's "nothing to disclose" statements were also false in light of the requirements of the Texas Business Opportunity Act ("BOA"). However, because the Court has already concluded that the "nothing to disclose" statements were false representations, the Court need not address this disagreement.

#### 4. Knowledge and/or Recklessness

##### a. "Nothing to Disclose" – Butera's Knowledge

191. OsteoStrong knew that its FDD "nothing to disclose" representations were untrue because Butera, its Vice President, knew of his own criminal history and bankruptcy filings. *See supra* I(F)(3)(a).

192. "Knowledge held by corporate officers or directors may be imputed to the corporation itself" because "[a] corporation can act and acquire knowledge only through its agents." *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (quoting *Poth v. Small, Craig & Werkenthin, L.L.P.*, 967 S.W.2d 511, 515 (Tex.App.-Austin 1998, pet. denied)). The knowledge of an officer or agent is notice to the company when the officer or agent in the line of his duty "ought, and could reasonably be expected, to act upon or communicate the knowledge to" the company.

*Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 580 (Tex. 1963); *see also City State Bank in Wellington v. U.S. Fid. & Guar. Co.*, 778 F.2d 1103, 1110 (5th Cir. 1985) (affirming district court's conclusion that a person's duty to a bank as an officer and director made his knowledge imputable to the bank). This is based on the "well-settled general rule of law that so long as the agent acts within the scope of his employment, in good faith, for the interest of his principal, he is presumed to have disclosed to his principal all the facts that come to his knowledge." *Mays v. First State Bank of Keller*, 247 S.W. 845, 846 (Tex. Comm'n App. 1923, judgm't adopted).

193. There is a limited exception to this rule when the agent's "interests in the transaction" are so incompatible with the interests of his principal "as practically to destroy the agency or to render it reasonably probable that an ordinary person, in the agent's position, under such circumstances, will neither act on behalf of his principal upon his so acquired knowledge, nor disclose that knowledge to his principal, but, because of such incompatibility in interests, will withhold such knowledge from the principal." *Goldstein v. Union Nat. Bank*, 213 S.W. 584, 590–91 (Tex. 1919). But this "adverse interest" exception only applies when the agent has an adverse interest "in the transaction." In a fraud case, "whether an employee's fraud is attributable to a corporation depends on whether the fraud was on behalf of the corporation or against it." *FDIC v. Ernst & Young*, 967 F.2d 166, 170–71 (5th Cir. 1992) (applying Texas law) (citations omitted) (hereinafter "FDIC"). The stockholders of a corporation whose officers commit fraud for the benefit of the corporation "are beneficiaries of the fraud," and "should not be allowed to escape all responsibility for such a fraud." *Id.* (quoting *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 190–91 (Tex.App.—Waco 1987, writ denied)).

194. Here, Butera participated in OsteoStrong's franchise sales while knowing that the FDDs falsely stated there was nothing to disclose about his background. The nondisclosures served OsteoStrong's interests by facilitating franchise sales. Thus, even if Butera also had a personal interest in concealing his background, his interests were not entirely adverse to OsteoStrong's.

195. Butera's position within OsteoStrong further supports imputing his knowledge to the company. "Because a corporation operates through individuals, the privity and knowledge of individuals at a certain level of responsibility must be deemed the privity and knowledge of the organization, 'else it could always limit its liability.' . . . Where the level of responsibility begins must be discerned from the circumstances of each case." *FDIC*, 967 F.2d at 171 (quoting *Cont'l Oil Co. v. Bonanza Corp.*, 706 F.2d 1365, 1376 (5th Cir. 1983)). Here, Butera was one of only two officers of the company. He was intimately involved in the negotiation of every contract at issue. This is not a close case: Butera was at the level of responsibility that "must be deemed the privity and knowledge of the organization." *Id.*

196. Even when the adverse-interest exception would otherwise apply, there is an "exception to the exception" when the corporation's officer with knowledge of the fraud personally participated in the transaction at issue. "[W]hen a principal has consummated a transaction in whole or in part through an agent, it is contrary to equity and good conscience that he should be permitted to avail himself of the benefits of his agent's participation without becoming responsible as well for his agent's knowledge as for his agent's act." *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 925 (Tex. 2010) (quoting *Goldstein*, 213 S.W. at 591). As the Texas Supreme Court stated:

> It is no defense that the home office at New Orleans did not have actual notice of such facts as it is inferable that [the Austin employees] possessed. [The Austin employees] were the agents of defendants in [their] transactions with [the bad customer], and were the only agents dealing directly with their customers at the Austin branch of their business. Furthermore, *the defendants retained the fruits of such dealings.* Knowledge of the facts acquired by [the Austin employees] in the matter of [the bad customer's] operations is imputed to defendants.

*Am. Sur. Co. of N. Y. v. Fenner*, 125 S.W.2d 258, 261 (Tex. 1939) (emphasis added).

197. An informative counterexample is supplied by *Arabesque Studios, Inc. v. Acad. of Fine Arts, Intern., Inc.*, 529 S.W.2d 564, 568 (Tex. Civ. App.—Dallas 1975, no writ). The issue there was whether a company should be deemed to know that an employee was, by her employment, breaching a non-compete agreement that she had made with a prior employer. Since the prior non-compete agreement had not been made on behalf of the current employer, the court found no reason to impute the employee's knowledge to the new employer. *Id.*

198. Here, in contrast, the Agreements were with, and for the benefit of, OsteoStrong. Butera participated in the negotiation of the Franchise Agreements and RDAs. He was the sole contact for the Burbanks, and the Simpsons' primary contact on at least the last four of their five contracts with OsteoStrong. OsteoStrong has retained the fruits of those transactions—franchise fees, royalties, equipment sales revenue, and RDA fees.

199. OsteoStrong contends that the adverse-interest exception applies because Butera had a personal adverse interest in not revealing information about his background because disclosure could have affected his employment. But merely acting in a personal interest is not enough—Butera must act *entirely* in his own interest to meet the "adverse interest exception." *See FDIC v. Shrader & York*, 991 F.2d, 216, 223–24 (5th Cir. 1993) (hereinafter "Shrader"). "In a case of joint interests, however, knowledge is imputed even though the agent's primary interest is inimical to that of his principal." *Askanase v. Fatjo*,

828 F.Supp. 465, 470–71 (S.D. Tex. 1993) (citing *Shrader*, 991 F.2d at 223). The record does not support a finding that Butera was acting solely for his own purposes; rather, it shows that he was acting for both his and OsteoStrong's benefit. Accordingly, the adverse-interest exception does not apply here.

200. The Court concludes that Butera's knowledge of his own criminal and bankruptcy background is imputed to OsteoStrong. Accordingly, OsteoStrong knew that its FDD "nothing to disclose" representations were untrue.

b. "Nothing to Disclose"—Zagrodzky's Knowledge or Recklessness

201. In addition to the knowledge imputed to OsteoStrong through Butera, OsteoStrong knew that its FDD "nothing to disclose" representations were untrue because Zagrodzky knew of Butera's criminal and bankruptcy history. Alternatively, at a minimum, Zagrodzky acted recklessly with respect to the truth of those representations. *See supra* I(F)(3)(b).

202. OsteoStrong's denial that Zagrodzky knew of Butera's disclosable criminal and bankruptcy history would not be dispositive even if true, because a fraud claim against a company does not require proof that the CEO was the officer who knew the truth.

203. A party acts recklessly if he makes representations "without any knowledge of the truth and as a positive assertion." *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992). A representation is recklessly made if the speaker knows that he does not have sufficient information or basis to support it. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex. 1983); *see Matis v. Golden*, 228 S.W.3d 301, 309 (Tex. App.—Waco 2007, no pet.).

204. Zagrodzky testified that he did not run a criminal background check on Butera, a prospective corporate officer, before OsteoStrong affirmatively represented that Butera had no criminal history to disclose. (Dkt. Nos. 253 at 21–23, 129–130). OsteoStrong's general counsel testified that he now believes that running a background check on officers before claiming there is "nothing to disclose" about them would be prudent. (Dkt. No. 256 at 21). Zagrodzky also admitted that he knew Butera had filed for bankruptcy but did nothing to determine whether the bankruptcy was disclosable other than ask Butera. (Dkt. No. 253 at 124); (*see also* Dkt. No. 254 at 163).

205. Moreover, the Court found that Zagrodzky told Butera to limit his answer to any bankruptcies or convictions that occurred while he was with OsteoStrong. (Dkt. Nos. 254 at 140–43, 160–63, 171–72).

206. The Court concludes that OsteoStrong knew that its FDD "nothing to disclose" representations were untrue because Zagrodzky knew of Butera's criminal

history and bankruptcy filings, which were required to be disclosed, and Zagrodzky's knowledge is imputed to OsteoStrong.

207. The Court also concludes that OsteoStrong's "nothing to disclose" representations were, at minimum, made recklessly.

**5. <u>Intent</u>**

208. OsteoStrong's general counsel conceded that OsteoStrong intended for franchisees, including the Franchisees, to rely on its representations in its FDDs. (Dkt. No. 256 at 21–22).

209. OsteoStrong knew that the Franchisees would evaluate the FDDs in determining whether to purchase a franchise. By providing the FDDs before the Franchisees executed the Agreements, OsteoStrong intended that the Franchisees consider and rely upon the FDD representations in deciding whether to proceed with the investment.

210. The Court concludes that OsteoStrong intended for the Franchisees to rely on its representations in its FDDs—namely, that Butera had no disclosable criminal or bankruptcy history—in deciding whether to enter into the Franchise Agreements and RDAs.

**6. <u>Justifiable Reliance</u>**

211. The Franchisees relied on OsteoStrong's representations in deciding whether to enter into the Agreements with OsteoStrong. They would not have contracted with OsteoStrong if they had known that Butera had recently been convicted of felony fraud. *See supra* I(F)(2).

212. The Franchisees' reliance was justifiable. As OsteoStrong's general counsel testified, franchisees are entitled to rely on the disclosures in the FDD when they sign a franchise agreement. (Dkt. No. 256 at 21).

213. It is no defense to a fraud claim that the victim might have learned of the falsity of a representation through the exercise of due diligence. "Where one has been induced to enter into a contract by fraudulent representations, the person committing the fraud cannot defeat a claim for damages based upon a plea that the party defrauded might have discovered the truth by the exercise of proper care." *Koral Indus. v. Sec.-Connecticut Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex. 1990) (quoting *Isenhower v. Bell*, 365 S.W.2d 354, 357 (Tex. 1963)).

214. In evaluating justifiable reliance, courts consider "a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud." *Grant Thornton*, 314 S.W.3d at 923.

215. Here, the Franchisees were not sophisticated businesspersons. None of them had any prior material business experience. (*See* Dkt. Nos. 251 at 65, 254 at 6–8). The Simpsons were dealing with family members. (Dkt. No. 253 at 98). There was no evidence that even sophisticated franchisees would, as a matter of course, run a criminal background check on every corporate officer with whom they are considering doing business. There was no evidence that the Franchisees had any reason to suspect that Butera was a convicted felon who had just been released from prison. Accordingly, the Court finds that a reasonably prudent person similarly situated to the Franchisees would not have independently investigated Butera after OsteoStrong falsely represented that there was nothing to disclose.

216. The Franchisees' reliance was not rendered unjustifiable by the sentence in the Franchise Agreements stating that "you have conducted an independent investigation of [the] OsteoStrong franchise opportunity." (*See, e.g.,* Dkt. No. 265-22 at 30). While a person may not justifiably rely on a misrepresentation if "there are 'red flags' indicating such reliance is unwarranted," *Grant Thornton*, 314 S.W.3d at 923, such "red flags" are generally found only when the language of the parties' contract directly contradicts the misrepresentation, or a sophisticated party has information that would indicate the representation was questionable. *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P., LLC,* 546 S.W.3d 648, 655–58 (Tex. 2018) (discussing multiple potential "red flags" that would not, on their own, disprove justifiable reliance); *see also In re JPG Renewables LLC*, No. 25-20021, 2026 WL 75906, at *10–11 (5th Cir. Jan. 9, 2026) (finding a clause in a memorandum advising investors to rely "on their own independent verification of the information" was not a red flag).

217. The "independent investigation" acknowledgment in the Franchise Agreements is not a "red flag." The acknowledgment states only that the franchisee had investigated the business opportunity, not that he or she had independently investigated the truthfulness of every statement in OsteoStrong's FDDs. Nothing in that acknowledgment suggests that OsteoStrong's FDD contained false information concerning the criminal background of its Vice President of Operations and Sales.

218. Nor was the Franchisees' reliance made unjustifiable by the "Entire Agreement" clause of the Franchise Agreements, or by the related parol evidence rule. (*See, e.g.,* Dkt. No. 265-22 at 32). It is firmly established that written contracts can be avoided for antecedent fraud or fraud in the inducement despite the presence of such a standard merger clause, and that "the parol evidence rule does not stand in the way of proof of such fraud." *Italian Cowboy*, 341 S.W.3d at 331–32. The Texas Supreme Court "recognized decades ago that agreeing to a merger clause does not waive the right to sue for fraud should a party later discover that the representations it relied upon before signing the contract were fraudulent." *Id.* at 327.

219. A merger clause will not bar a fraudulent-inducement claim based on pre-contract representations merely because it states that no representations were made

outside the contract. *Id.* at 334 ("Standard merger clauses . . . often contain language indicating that no representations were made other than those contained in the contract, without speaking to reliance at all."). While a fraudulent-inducement claim may be foreclosed when sophisticated parties represented by counsel clearly and unequivocally disclaim reliance on representations about the specific matter in dispute, *id.* at 332–33, there is no such disclaimer of reliance here, and the Franchisees are not sophisticated in business matters. "Pure merger clauses, without an expressed clear and unequivocal intent to disclaim reliance or waive claims for fraudulent inducement, have never had the effect of precluding claims for fraudulent inducement." *Id.* at 334.

220. Moreover, the merger clauses here expressly preserved the Franchisees' right to rely on the representations made in the FDDs, stating "nothing in this Agreement shall disclaim or require you to waive reliance on any representation that Franchisor made in the Franchisor's [FDD]." (*See, e.g.*, Dkt. No. 265-22 at 30).

221. The reliance-disclaimer clauses also expressly preserved the Franchisees' right to rely on representations made in the FDDs, stating "Except for representations contained in Franchisor's [FDD] provided to you in conjunction with this franchise offering, you represent that neither Franchisor nor its agents or representations have made any representations, and you have not relied on representations made by Franchisor or its agents or representatives, concerning actual or potential Gross Sales, expenses or profit of an OsteoStrong Center." (*See, e.g.*, *id.*).

222. Accordingly, the Court concludes that the Franchisees' reliance was justifiable.

**7. <u>Injury</u>**

223. The Court concludes that the Burbanks lost $244,242 through their investments in OsteoStrong. *See supra* I(H)(1). Those losses are recoverable because out-of-pocket damages, which derive from a restitutionary theory, are available as direct damages for fraudulent inducement. *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015).

224. The Court also concludes that the Simpsons were injured. *See supra* I(H)(1).

225. "A defrauded party is entitled to those damages resulting directly and naturally from fraud." *Scott v. Sebree*, 986 S.W.2d 364, 371 (Tex. App.—Austin 1999, pet. denied). Thus, the Franchisees were not required to prove that Butera's criminal or bankruptcy history itself caused their losses. Rather, they were required to establish that OsteoStrong's misrepresentations induced them to enter into the Agreements and that the claimed losses resulted directly and naturally from that fraud.

### 8. **Summary**

226. The Court concludes that the preponderance of the evidence establishes that the Franchisees were fraudulently induced to enter into the Agreements. Accordingly, the Burbanks have established the elements of their affirmative fraudulent-inducement claim against OsteoStrong by a preponderance of the evidence.

227. The Burbanks and Simpsons have established the elements of their fraudulent-inducement affirmative defense to OsteoStrong's breach-of-contract counterclaim by a preponderance of the evidence.

### 9. **Economic Loss Rule**

228. OsteoStrong contends that the Franchisees' fraud claims and affirmative defenses are barred by the economic-loss doctrine, because the only losses alleged by the Franchisees are economic losses governed by the terms of the Franchise Agreements and RDAs. In its view, "the economic loss rule 'generally precludes recovery in tort for economic losses resulting from the failure of a party to perform under a contract.'" *Garcia v. Universal Mortgage, Corp.*, No. 3:12-CV-02460, 2013 WL 1858195, at *9 (N.D. Tex. May 3, 2013) (dismissing fraud claim based on economic-loss rule) (quoting *Lamar Homes, Inc. v. Mid Continent Cas. Co.*, 242 S.W.3d 1, 12 (Tex. 2007)). Tort damages are generally not available if the alleged conduct "would give rise to liability only because it breaches the parties' agreement." *Garcia*, 2013 WL 1858195, at *9 (quoting *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991)). "When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract." *DeLanney*, 809 S.W.2d at 494.

229. The Texas Supreme Court has expressly rejected application of the economic-loss rule to fraudulent-inducement claims:

> We too reject the application of *DeLanney* to preclude tort damages in fraud cases. Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations. As a rule, a party is not bound by a contract procured by fraud. Moreover, it is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself. . . . Our prior decisions also clearly establish that tort damages are not precluded simply because a fraudulent representation causes only an economic loss. . . . Accordingly, tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic

> loss related to the subject matter of the contract. Allowing the recovery of fraud damages sounding in tort only when a plaintiff suffers an injury that is distinct from the economic losses recoverable under a breach of contract claim is inconsistent with this well-established law, and also ignores the fact that an independent legal duty, separate from the existence of the contract itself, precludes the use of fraud to induce a binding agreement.

*Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 46–47 (Tex. 1998) (citations omitted).

230. Accordingly, the economic-loss rule does not bar the Franchisees' fraudulent-inducement claims and defenses.

**10. <u>Statute of Limitations</u>**

231. OsteoStrong argues that the Burbanks' fraud and fraudulent-inducement claims are barred by the statute of limitations. The Burbanks respond that OsteoStrong's statute of limitations argument erroneously relies on deferral rules that apply to nonfraud claims.

232. The statute of limitations on a fraud claim is 4 years. Tex. Civ. Prac. & Rem. Code Ann. § 16.004.

233. For claims other than fraud, the discovery rule is a narrow exception to the legal-injury rule that defers accrual of a cause of action "until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action." *Berry v. Berry*, 646 S.W.3d 516, 524 (Tex. 2022). The discovery rule applies where the injury is both inherently undiscoverable and objectively verifiable. *See Archer v. Tregellas*, 566 S.W.3d 281, 290 (Tex. 2018). "An injury is 'inherently undiscoverable' if it is . . . unlikely to be discovered within the prescribed limitations period despite due diligence." *Wilkins v. Chesapeake Expl. Ltd. P'ship*, No. 9:09-CV-00128, 2011 WL 13143508, at *11 (E.D. Tex. Jan. 7, 2011) (citing *S.V. v. R.V.*, 933 S.W.2d 1, 7 (Tex. 1996)). "An injury is 'objectively verifiable' if both the wrong and the resulting injury are demonstrated by direct, physical evidence or are otherwise beyond dispute." *Id.* (citing *S.V.*, 933 S.W.2d at 6–7).

234. That said, the Texas Supreme Court has long distinguished the accrual rule applicable to fraud claims from the discovery-rule framework applicable to nonfraud claims. *S.V.*, 933 S.W.2d at 4 ("Strictly speaking, the cases in which we have deferred accrual of causes of action for limitations purposes fall into two categories: those involving fraud and fraudulent concealment, and all others. The deferral of accrual in the

latter cases is properly referred to as the discovery rule."). Thus, the "inherently undiscoverable and objectively verifiable" requirements ordinarily governing application of the discovery rule do not control the accrual of a claim based on fraud. Because "fraud vitiates whatever it touches," *Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex. 1983), the limitations period for a fraud claim does not begin to run until the fraud is discovered or, through the exercise of reasonable diligence, should have been discovered. *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015). The same accrual rule applies to fraudulent-inducement claims because fraudulent inducement is "a subspecies of fraud." *Id*. Fraudulent concealment is related but distinct. It is an equitable-estoppel doctrine that tolls limitations when a defendant conceals its wrongdoing and thereby prevents the plaintiff from timely discovering the cause of action. *See Marcus & Millichap Real Estate Investment Services of Nevada, Inc. v. Triex Texas Holdings, LLC*, 659 S.W.3d 456, 463–64 (Tex. 2023). Its estoppel effect ends when the plaintiff discovers the concealed wrongdoing or learns of facts that, through reasonable diligence, would lead to its discovery. *Id*. at 464.

235. Accordingly, the relevant question here is whether the Burbanks discovered or, through the exercise of reasonable diligence, should have discovered OsteoStrong's alleged fraud more than four years before they filed suit. *See Hooks*, 457 S.W.3d at 57.

236. The mere availability of information in public records does not automatically establish a lack of reasonable diligence. Public records may, under some circumstances, establish as a matter of law that reasonable diligence would have uncovered the fraud. *See Hooks*, 457 S.W.3d at 57–59. But whether they do so depends on the circumstances, including whether the claimant had an obligation or reason to search those records. Under Texas law, "the recording of a document in public records serves as constructive notice for limitations purposes only for those persons who are under an obligation to search the records." *Vanderbilt Mortg. & Fin., Inc. v. Flores*, 692 F.3d 358, 367 (5th Cir. 2012). And "when the rationale for imposing constructive notice is lacking, public records have not been held to create an irrebuttable presumption of notice." *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 887 (Tex. 1998).

237. Here, the Burbanks were entitled to rely on OsteoStrong's affirmative representations that there was "nothing to disclose" about Butera. OsteoStrong identifies no fact that should have caused the Burbanks to suspect, more than four years before they filed suit, that Butera was a convicted felon or that OsteoStrong's representations concerning his background were false. Nor has OsteoStrong identified any basis for concluding that the Burbanks were obligated, absent such notice, to search public criminal or bankruptcy records to verify the representations in OsteoStrong's FDD. Accordingly, the Court finds that the Burbanks neither discovered nor, through the exercise of reasonable diligence, should have discovered the fraud more than four years before filing suit. Their fraud and fraudulent-inducement claims are therefore timely.

**11. <u>Failure to Disclose</u>**

238. "To establish fraud by non-disclosure, the plaintiff must show: (1) the defendant deliberately failed to disclose material facts; (2) the defendant had a duty to disclose such facts to the plaintiff; (3) the plaintiff was ignorant of the facts and did not have an equal opportunity to discover them; (4) the defendant intended the plaintiff to act or refrain from acting based on the nondisclosure; and (5) the plaintiff relied on the non-disclosure, which resulted in injury." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 219–20 (Tex. 2019).

239. Because the Court has already concluded that the Franchisees were fraudulently induced to enter the Agreements, *see supra* II(B)(8), the Court need not decide whether OsteoStrong's misrepresentations and omissions in the FDDs also support an independent claim for fraud by non-disclosure.

**12. <u>Zagrodzky's Liability in an Individual Capacity</u>**

240. Texas law has "'long held' that corporate agents are 'personally liable for [their] own fraudulent or tortious acts . . . even though they were acting on behalf of the corporation." *Keyes v. Weller*, 692 S.W.3d 274, 279 (Tex. 2024) (quoting *Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002)). Indeed, "the law is well-settled that a corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a representative of the corporation." *Bates Energy Oil & Gas v. Complete Oilfield Services*, 361 F. Supp.3d 633, 666 (W.D. Tex. 2019) (quoting *Kingston v. Helm*, 82 S.W.3d 755, 759 (Tex. App.—Corpus Christi–Edinburg 2002, pet. denied)).

241. The Court concludes that Zagrodzky personally participated in the fraudulent representations contained in OsteoStrong's FDDs. As found above, the preponderance of the evidence establishes that, as early as 2013, Zagrodzky knew that Butera's felony conviction and bankruptcy were required to be disclosed in Items 3 and 4 of the FDDs. The Court also credits Butera's testimony that Zagrodzky told him to limit his disclosures to bankruptcies or convictions that occurred while he was with OsteoStrong.

242. The Court concludes that Zagrodzky knew that Butera had a felony conviction and bankruptcy history that were required to be disclosed when OsteoStrong provided its FDDs to the Franchisees. Even if he did not have actual knowledge of the date on which the bankruptcy occurred, Zagrodzky was at least reckless with regard to the representations in the FDDs about Butera's background.

243. For the reasons explained above, the remaining elements of fraudulent inducement—materiality, intent, justifiable reliance, and injury—are also satisfied as to the fraudulent representations in which Zagrodzky personally participated.

244. The Court therefore concludes that Zagrodzky is individually liable to the Burbanks for fraudulent inducement.

### C. OSTEOSTRONG'S BREACH OF CONTRACT COUNTERCLAIMS

245. OsteoStrong alleges that (1) the Burbanks and Simpsons breached each of their Franchise Agreements by failing to pay royalties and advertising fees; (2) the Simpsons breached their RDAs by failing to meet their development schedules; and (3) the Simpsons breached the "injurious acts" provisions of their agreements.

#### 1. Legal Standard

246. Texas courts apply standard contract-law principles to franchise-agreement disputes. To establish breach of a franchise agreement, the plaintiff must prove four elements: (1) the existence of a valid contract, (2) the plaintiff performed or tendered performance as the contract required, (3) the defendant breached the contract by failing to perform or tender performance as the contract required, and (4) the plaintiff sustained damages as a result of the breach. *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007); *Upshaw v. Lacado, LLC*, 650 S.W.3d 61 (Tex. App.—Fort Worth 2021, pet. denied). [Agreed]

247. To prove an action for breach of contract, the plaintiff must establish there is an enforceable contract. *McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 392 (Tex. 2019). To prove an enforceable contract, a party must establish the following elements: (1) an offer, (2) an acceptance, (3) mutual assent, (4) execution and delivery of the contract with the intent that it be mutual and binding, and (5) consideration supporting the contract. *Campbellton Rd. Ltd. v. City of San Antonio*, 688 S.W.3d 105, 115 (Tex. 2024); *Valley Forge, Inc. v. CK Constr., Inc.*, 677 S.W.3d 127, 132 (Tex. App.—El Paso 2023, no pet.). Whether a contract is enforceable is a question of law. *Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 823 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). [Agreed]

248. To prove an action for breach of contract, the plaintiff must establish that it performed, tendered performance of, or was excused from performing its contractual obligations. *Krayem v. USRP (PAC), LP*, 194 S.W.3d 91, 94 (Tex. App.—Dallas 2006, pet. denied). The plaintiff may establish that it fully or substantially performed its contractual obligations. *Weitzul Constr., Inc. v. Outdoor Environs.*, 849 S.W.2d 359, 363 (Tex. App.—Dallas 1993, writ denied). "Full performance" means all contractual duties have been fulfilled and nothing is left to be done. *Vance v. My Apt. Steak House*, 677 S.W.2d 480, 481 (Tex. 1984). [Agreed]

249. To prove an action for breach of contract, the plaintiff must establish that the defendant breached the contract. *Southwell v. University of the Incarnate Word*, 974 S.W.2d 351, 354-55 (Tex. App.—San Antonio 1998, pet. denied). "Breach" means the failure, without legal excuse, to perform a promise that forms all or part of an agreement,

the refusal to recognize the existence of an agreement, or the doing of something inconsistent with its existence. *DeSantis v. Wackenhut Corp.*, 732 S.W.2d 29, 34 (Tex. App.—Houston [14th Dist.] 1987), *rev'd in part on other grounds*, 793 S.W.2d 670 (Tex. 1990). [Agreed]

250. To prove an action for breach of contract, the plaintiff must establish that the defendant's breach caused it injury. *Southwell*, 974 S.W.2d at 354. [Agreed]

251. If a contract expressly provides that time is of the essence, then a party must perform by the specified time. *McKnight v. Renfro*, 371 S.W.2d 740, 745 (Tex. App.—Dallas 1963, writ ref'd n.r.e.). [Agreed]

**2. <u>The Franchisees' Affirmative Defenses</u>**

a. <u>Fraudulent Inducement</u>

252. "A party is not bound by a contract procured by fraud." *Formosa Plastics Corp. USA*, 960 S.W.2d at 46.

253. As discussed, the Court has concluded that the Agreements were fraudulently induced. *See supra* II(B)(8). Accordingly, OsteoStrong may not enforce the Agreements against the Franchisees, and the Franchisees are excused from performance under them.

254. OsteoStrong argues that the General Releases signed by the Simpsons bar them from asserting fraudulent inducement as an affirmative defense to OsteoStrong's breach-of-contract counterclaims. The Court rejects OsteoStrong's argument. The releases speak in terms of claims and demands against OsteoStrong; they do not waive defenses to claims asserted by OsteoStrong. (*See* Dkt. Nos. 247-6, 247-10).

b. <u>Abandoned Defenses</u>

255. The Franchisees did not present any evidence or argument supporting two of their affirmative defenses at trial—namely, equitable estoppel and public policy.[4]

---

[4] The Franchisees twice mentioned "public policy" in closing argument, but those references concerned enforcement of the injurious-acts provision against Sean Simpson. (See Dkt. No. 272 at 27–28) ("I would also suggest that there is a public policy aspect as to the way you enforce this agreement. Should a federal court be enforcing an agreement, interpreting an agreement as prohibiting the parties from filing suit when they feel like they've—their rights have been violated under the contract . . . As a matter of public policy, I don't think a federal court should decide that's [] the rule, that you can do that."). The Franchisees did not argue that public policy independently rendered the Agreements as a whole unenforceable.

Therefore, the Court concludes that the Franchisees have abandoned these affirmative defenses, and the Court need not address them further.

c. Remaining Defenses

256. Because the Court has concluded that the fraudulent-inducement affirmative defense excuses the Franchisees' performance under the Agreements, the Court need not decide whether the following asserted affirmative defenses would also excuse performance under the Agreements: (1) repudiation and prior breach, (2) waiver, (3) promissory estoppel, (4) modification, (5) illegality, (6) interference with performance of the RDAs, and (7) commercial impracticability/impossibility of RDA performance.

### 3. Valid and Existing Contracts

257. Even if a contract was valid and enforceable at its inception, it is voidable at the victim's option if it was procured by fraud. *Harris v. Archer*, 134 S.W.3d 411, 427 (Tex. App.—Amarillo 2004, pet. denied).

258. OsteoStrong asks the Court to conclude that the Agreements and the Guarantys are valid and existing contracts. However, because the Court has already determined that the Agreements were procured by fraud, and because the Guarantys were dependent on those Agreements, the Franchisees were entitled to avoid the Agreements and Guarantys. Accordingly, the Court declines to decide whether the Agreements and the Guarantys were valid and existing contracts at their inception.

### 4. OsteoStrong's Performance

259. Because the Agreements have been avoided based on OsteoStrong's fraudulent inducement, the Court need not decide whether OsteoStrong performed, tendered performance, or was excused from performing its contractual obligations.

### 5. The Franchisees' Performance

260. Because the Agreements are unenforceable against the Franchisees based on OsteoStrong's fraudulent inducement, any inquiry into the Franchisees' subsequent performance or alleged non-performance is immaterial. Accordingly, the Court concludes that the Franchisees were excused from performance under the Agreements and Guarantys.

### 6. Contract Damages

261. Because the Agreements are unenforceable against the Franchisees due to OsteoStrong's fraudulent inducement, *see supra* II(C)(2)(a), the Court concludes that: (1) OsteoStrong is not entitled to recover any damages on its breach-of-contract counterclaim against the Simpsons under the Simpson Franchise Agreements;

(2) OsteoStrong is not entitled to recover any damages on its breach-of-contract counterclaim against the Burbanks under the Burbank Franchise Agreement; (3) OsteoStrong is not entitled to recover any damages on its breach-of-contract counterclaim against the Simpsons under the Simpson RDAs; and (4) OsteoStrong is not entitled to recover under the Guarantys executed by the Franchisees.

**7. <u>OsteoStrong's Injurious-Act Claim</u>**

262. OsteoStrong identified Section 15.1.1 of the Simpson Franchise Agreements and Section 10.5.1 of the Simpson RDAs as the bases of its injurious-act claim. In those sections, the Simpsons agreed not to compete with OsteoStrong or perform "any other act injurious or prejudicial to the goodwill associated with the Marks and the System." Further, Section 10.6.1 of the Simpson RDAs specified that the injurious-act provision remained in effect for a two-year period following termination of the RDA.

263. Because the Agreements are unenforceable due to OsteoStrong's fraudulent inducement, *see supra* II(C)(2)(a), the Court concludes that OsteoStrong is not entitled to recover any damages on its injurious-act counterclaim against the Simpsons.

**8. <u>Failure to Mitigate RDA Damages</u>**

264. Because the Court has concluded that OsteoStrong was not entitled to any damages on its breach-of-contract counterclaims, the Court need not address the Franchisees' contention that OsteoStrong failed to exercise reasonable care in mitigating its damages.

**D. RELIEF**

**1. <u>Interest</u>**

265. Prejudgment interest is governed by state law in diversity cases such as this. *Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*, 7 F.3d 1203, 1208 (5th Cir. 1993). "When there is no specific enabling statute granting damages, Texas allows for the award of prejudgment interest under 'general principles of equity' and follows the principles currently set out in Tex. Fin. Code Ann § 304 . . . ." *L&C Consultants, LLC v. ASH Petro., Inc.*, No. 3:07-CV-01904, 2009 WL 3110200, at *10 (N.D. Tex. Sep. 29, 2009) (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998)). Under that scheme, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed. *Johnson & Higgins*, 962 S.W.2d at 531; Tex. Fin. Code § 304.104. Prejudgment interest is calculated as simple interest. *Johnson & Higgins*, 962 S.W.2d at 532.

266. The Burbanks gave written notice of their claims on June 1, 2018. (Dkt. No. 265-188). Accordingly, prejudgment interest on their damages award accrues from November 28, 2018.

267. The prejudgment interest rate is determined when judgment is entered and is calculated using the Texas postjudgment-interest rate then in effect. *See Johnson & Higgins*, 962 S.W.2d at 532; Tex. Fin. Code § 304.003. It can be found at https://occc.texas.gov/publications/interest-rates. The rate is currently 6.75% for judgments entered in September 2026.

268. Post-judgment interest is governed by federal law. *Travelers*, 7 F.3d at 1209. Post-judgment interest is awarded as a matter of course on any money judgment recovered in a civil case in district court. *See Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 173 (5th Cir. 2010); *see also* 28 U.S.C. § 1961(a). The post-judgment interest rate is "equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding." 28 U.S.C. § 1961(a). The applicable post-judgment interest rate can be found at https://www.txs.uscourts.gov/page/post-judgment-interest-rates-2026. For the week ending September 25, 2026, the rate is 4.48%.

**2. <u>Attorneys' Fees</u>**

269. "Attorney's fees are not recoverable either in an action in tort or a suit upon a contract unless provided by statute or by contract between the parties." *New Amsterdam Cas. Co. v. Tex. Indus.*, 414 S.W.2d 914, 915 (Tex. 1967). Texas law does not authorize statutory attorneys' fees for fraudulent inducement. *See IAS Servs. Grp., LLC v. Jim Buckley & Assoc., Inc.*, No. 5:14-CV-00180, 2024 WL 3565008, at *6 (W.D. Tex. July 23, 2024). Accordingly, the Franchisees may recover attorneys' fees here only if recovery is authorized "by contract between the parties." *New Amsterdam Cas. Co.*, 414 S.W.2d at 915.

270. The Agreements provide: "If either party commences a legal action against the other party arising out of or in connection with this Agreement, the prevailing party shall be entitled to have and recover from the other party its reasonable attorneys' fees and costs of suit." (Dkt. Nos. 247-1 at 32, 247-4 at 33, 247-7 at 32, 247-12 at 32, 247-16 at 24, 247-18 at 24).

271. "Whether a party prevails turns on whether the party prevails upon the court to award it something, either monetary or equitable." *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 655 (Tex. 2009).

272. Because the Court has found that the Franchisees were fraudulently induced to enter the Agreements and that OsteoStrong may not enforce those Agreements against them, OsteoStrong cannot be considered a "prevailing party" entitled to recover its attorneys' fees under the Agreements. *LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, LLC*, 659 F.3d 450, 465 (5th Cir. 2011). This is so even though OsteoStrong obtained dismissal of other claims asserted by the Franchisees. *Id.*

273. The question remains, however, whether a party who successfully establishes fraudulent inducement and thereby avoids enforcement of the contract can nonetheless recover attorneys' fees under a "prevailing party" fee provision. Neither the Court nor the Parties have located any controlling case law [5] addressing this question.

274. "Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the bargain measure." *Zorrilla*, 469 S.W.3d at 153 (quoting *Formosa Plastics Corp. USA*, 960 S.W.2d at 49). The out-of-pocket measure derives from a restitutionary theory, while the benefit-of-the-bargain measure derives from an expectancy theory. *Id*. These measures of damages are distinct from the defrauded party's choice whether to affirm or avoid the contract. A party fraudulently induced into a contract may "stand to the bargain and recover damages for the fraud" or may rescind the contract and seek restoration of the consideration exchanged. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 676–77 (Tex. 2000); *see also Neese v. Lyon*, 479 S.W.3d 368, 380 (Tex. App.—Dallas 2015, no pet.).

275. Here, the Burbanks seek out-of-pocket damages, *see supra* I(H)(1), and both the Burbanks and the Simpsons have successfully avoided enforcement of the Agreements by establishing fraudulent inducement, *see supra* II(C)(2)(a), II(C)(5). The Court therefore concludes that, having elected to avoid enforcement of the Agreements, the Franchisees may not simultaneously enforce the Agreements' prevailing-party provisions to obtain attorneys' fees. To hold otherwise would permit the Franchisees to avoid the Agreements' contractual obligations while enforcing a contractual benefit contained in those same Agreements.

276. Accordingly, the Court concludes that the Franchisees are not entitled to recover their attorneys' fees.

## III. CONCLUSION

Based on the foregoing, the Court finds as follows:

277. The Burbanks have proved their affirmative fraudulent-inducement claim and fraudulent-inducement affirmative defense by a preponderance of the evidence. They are entitled to damages on their affirmative claim.

---

[5] As the Franchisees explain, "[t]wo of the [F]ranchise [A]greements specify that all claims arising out of or related to the agreement or the parties' relationship created by it are governed by Texas law. The other two [Franchise Agreements] specify Tennessee law. The parties have not, however, identified any material differences in the applicable laws of Texas and Tennessee." (Dkt. No. 271 at 62). The Court will therefore limit its attorneys' fees discussion to Texas law.

278. The Burbanks are entitled to have and recover $244,242 in damages from OsteoStrong and Zagrodzky, jointly and severally.

279. The Burbanks are entitled to prejudgment interest on that amount at the rate of 6.75% per annum from November 28, 2018, through the date preceding entry of judgment.

280. The Burbanks are entitled to postjudgment interest on that amount at the federal rate of 4.48%, from the date judgment is entered until paid.

281. The Simpsons have proved their affirmative defense of fraudulent inducement by a preponderance of the evidence.

282. The Simpsons' request to revive their previously dismissed affirmative fraudulent-inducement claim is denied. Accordingly, they are not entitled to recover damages on that claim.

283. OsteoStrong shall take nothing on its counterclaims.

The Court will enter a separate final judgment consistent with these Findings of Fact and Conclusions of Law.

It is SO ORDERED.

Signed on September 30, 2026.

Drew B Tipton

DREW B. TIPTON
**UNITED STATES DISTRICT JUDGE**